Henry B. ROESBERG, Sr. and
Pauline E. Roesberg

v.

JOHNS–MANVILLE CORP., Johns-Manville Sales Corporation, Raybestos-Manhattan, Inc., Owens-Corning Fiberglass Corp.-Nicolet Industries, Inc., Pittsburgh Corning Corporation, Celotex Corporation-Unarco Industries, Inc., Eagle-Picher Industries, Inc., Keen Corporation-Pacor, Inc., Brand Insulations, Inc., A.C. & S., Inc., Armstrong Cork Company, Amatex Corporation, GAF Corporation, Southern Asbestos Company, H. K. Porter, Inc.

Civ. A. No. 79–3016.

United States District Court,
E. D. Pennsylvania.

Jan. 24, 1980.

Mitchell Cohen, Norman Pearlberger, Philadelphia, Pa., for plaintiffs.

Dudley Hughes, Edward Greer, John P. Kelley, Philadelphia, Pa., Rolf Gilbert, Morrisville, Pa., John J. Connors, Jr., Southampton, Pa., for defendants.

## MEMORANDUM AND ORDER

TROUTMAN, District Judge.

Laborers working with, handling and using asbestos, material containing asbestos, and asbestos products and compounds have instituted litigation with increasing frequency to recover compensatory damages for asbestos-related respiratory and cardiovascular diseases such as asbestosis, mesothelioma, scarred lungs, lung cancer and other tissue and bone disorders.[1] Plaintiff,[2] an insulator associated with Local 14 of the Asbestos Workers' Union from 1942 to 1977 and employed by various companies during this time period, continually worked and allegedly came in constant contact with asbestos products mined, manufactured, produced, processed, compounded, converted, sold, merchandised and distributed by defendants, whom plaintiff alleges knew, could or should have known were inherently defective, ultrahazardous, dangerous, deleterious, poisonous and "otherwise highly harmful" to plaintiff and other employees. More specifically, plaintiff charges defendants with failing to take reasonable precautions or to exercise reasonable care in warning plaintiff adequately; to provide plaintiff with knowledge of reasonable safeguards such as wearing apparel and safety equipment and appliances for protection from asbestos dust and fibers; to place on containers of asbestos products warnings emphasizing potential risks, dangers and harm resulting from use and handling

---

1. In this district alone thirteen asbestos cases are presently pending, many with multiple plaintiffs and all with multiple defendants.

2. Both Henry Roesberg and his wife are named plaintiffs. For the sake of convenience they are referred to as "plaintiff".

thereof; to package asbestos products in a manner designed to avoid contact with, exposure to and inhalation of asbestos dust and fibers from these products; to make efforts reasonably calculated to inform plaintiff of the inherently dangerous and harmful effects thereof; to take any reasonable precaution or to exercise care to protect plaintiff from the harms and dangers thereof; to adopt and enforce safety regulations, plans or methods for plaintiff while working therewith; to test adequately asbestos products before offering them for sale and use by plaintiff; to render asbestos products safe or to provide proper and sufficient safeguards for the use and handling thereof; to remove and recall asbestos products from the stream of commerce upon learning that they could cause injuries similar to those of which plaintiff complains; to comply with the Federal Hazardous Substance Act, 15 U.S.C. § 1261 *et seq.*; and to advise plaintiff, whom defendants knew, could or should have known had been exposed to long-term contact therewith and to terminate this exposure, to have plaintiff examined by a lung specialist or to receive treatment for any diseases caused by contact, exposure or inhalation thereof.

Continuing, plaintiff alleges breach of an implied warranty that the asbestos products were reasonably fit for use and safe for their intended purposes. Plaintiff complains that the products were defective in that they were incapable of being made safe for their ordinary and intended use and purpose because of their intrinsically dangerous and ultrahazardous nature. Plaintiff also accuses defendants, individually and in conspiracy with one another, of manufacturing, selling and distributing these products despite knowledge on their part of the products' unreasonably dangerous, ultrahazardous and potentially carcinogenic and lethal effects, of concealing this knowledge from plaintiff willfully and fraudulently, and of keeping plaintiff ignorant of his rights not only by concealing the nature and extent of harm suffered by using asbestos products and the causal relationship between them but also by inducing plaintiff

to rely in good faith on these fraudulent representations.

Finally, plaintiff claims that defendants intentionally and fraudulently withheld or misrepresented medical conditions *of* and altered other material and significant medical information *about* other asbestos workers and employees, including plaintiff, by reviewing and altering medical records and test results to prevent discovery of plaintiff's actual medical condition, to deter or sacrifice plaintiff's ability to file workmen's compensation or other disability claims, to obtain proper medical care, to increase the risk of harm and further complications arising from asbestos-related diseases, to prevent plaintiff and others from exercising the option of terminating their employment because of unsafe health conditions or taking precautionary safety measures on their own behalf, and to prevent, limit or otherwise bar plaintiff's right to seek compensatory and/or punitive damages. The last portion of the alleged conspiracy involves defendants' efforts to "camouflage and make indistinguishable" these products so that injured plaintiffs would not know the true identity thereof. In furtherance of the alleged conspiracy, defendants supposedly entered into "occult relabelling and distribution agreements" and intentionally and fraudulently manufactured products without labels or salient characteristics and with identical colors, textures and appearances in order to deceive users, including plaintiff, and to limit and exclude liability from claims brought by injured users.

■ In September 1979 plaintiffs filed fifty-seven separate interrogatories with all defendants, of which one, GAF Corporation (GAF), answered six but objected to the others as "overly broad", "burdensome", "oppressive", "not reasonably calculated to lead to discoverable evidence" and "privileged". Plaintiffs then moved to compel answers thereto, and the magistrate so ordered. GAF now appeals from that order.

■ Recently describing the scope of discovery under Fed.R.Civ.P. 26(b)(1), this Court ruled that

[r]elevancy, and to a lesser extent burdensomeness, constitute the principal inquiry in ruling upon objections to interrogatories. *Superior Coal Co. v. Ruhrkohle, A. G.*, 83 F.R.D. 414, 422 (E.D.Pa. 1979), *In re United States Financial Securities Litigation,* 74 F.R.D. 497, 498 (S.D. Cal.1975), *Greene v. Raymond,* 41 F.R.D. 11, 14 (D.Colo.1966), *Lumberman's Mutual Casualty Co. v. Pistorino & Co.,* 28 F.R.D. 1, 2 (D.Mass.1961). In the interests of fair trial, eliminating surprise and achieving justice, *United States v. Purdome,* 30 F.R.D. 338, 340 (W.D.Mo.1962), *Stonybrook Tenants Association, Inc. v. Alpert,* 29 F.R.D. 165, 168 (D.Conn.1961), relevancy, construed liberally, creates a broad vista for discovery, *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978), *Schlagenhauf v. Holder,* 379 U.S. 104, 121, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964), *Hickman v. Taylor,* 329 U.S. 495, 507, 67 S.Ct. 385, 91 L.Ed. 451 (1947) . . . and makes trial "less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent". *United States v. Proctor & Gamble Co.,* 356 U.S. 677, 682, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958).

*McClain v. Mack Trucks, Inc.,* 85 F.R.D. 53, 57 (E.D.Pa.1979). Additionally, the facts and circumstances of each case determine and limit relevance of interrogatories. *Shang v. Hotel Waldorf Astoria Corp.,* 77 F.R.D. 468, 469 (S.D.N.Y.1978), *Hoffman v. Wilson Line, Inc.,* 7 F.R.D. 73, 74 (E.D.Pa. 1946).

In Interrogatory Number Three plaintiff seeks to discover asbestos products which GAF manufactured, processed, compounded, converted, sold, supplied or distributed since 1925.[3] GAF's primary objection to this interrogatory is the broad time frame included by plaintiff, whose employment spanned the years 1942 to 1977. However, plaintiff alleges conspiracies antedating plaintiff's employment history and intended to disguise and distort information which would have suggested to plaintiff the unreasonably dangerous and ultrahazardous nature of working with asbestos. Accordingly, plaintiff's selected time frame is not wholly unreasonable or irrelevant. Such a request for discovery should be considered relevant

> if there is any possibility that the information sought may be relevant to the subject matter of the action. . . . Discovery should ordinarily be allowed under the concept of relevancy unless it is clear that the information sought can have no possible bearing upon the subject matter of the action. . . . The scope of examination by interrogatories should not be curtailed unless the information sought is clearly irrelevant.

*Miller v. Doctor's General Hospital,* 76 F.R.D. 136, 138–39 (W.D.Okl.1977) (citations omitted). *See also In re Folding Carton Antitrust Litigation,* 83 F.R.D. 251, 254 (N.D.Ill.1978), *United States v. IBM Corp.,* 66 F.R.D. 215, 218 (S.D.N.Y.1974), *Cleo Wrap Corp. v. Elsner Engineering Works,* 59 F.R.D. 386, 388 (M.D.Pa.1972). Plaintiff's request falls squarely within the limits of the subject matter of this action.

GAF also complains that the word "associated" in subsection (b) is vague and ambiguous. The meaning of this verb is clear in the context of the principal part of the interrogatory, in which plaintiff asks GAF to itemize all asbestos products which GAF manufactured, processed, compounded, converted, sold, supplied and distributed.

Finally, GAF objects generally to this interrogatory as "overly broad, burdensome, oppressive and irrelevant", a complaint which GAF echoes with virtually every other interrogatory. To voice a successful objection to an interrogatory, GAF cannot simply intone this familiar litany. Rather, GAF must show specifically how, despite the broad and liberal construction afforded the federal discovery rules, each interrogatory is not relevant or how each question is overly broad, burdensome or oppressive, *Trabon Engineering Corp. v. Ea-*

---

3. See Appendix, *infra* at 304.

ton Manufacturing Co., 37 F.R.D. 51, 54 (N.D.Ohio 1964), Stanley Works v. Haeger Potteries, Inc., 35 F.R.D. 551, 555 (N.D.Ill. 1964), by submitting affidavits or offering evidence revealing the nature of the burden. Leumi Financial Corp. v. Hartford Accident & Indemnity Corp., 295 F.Supp. 539, 544 (S.D.N.Y.1969), Wirtz v. Capital Air Service, Inc., 42 F.R.D. 641, 643 (D.Kan. 1967). The court is not required to "sift each interrogatory to determine the usefulness of the answer sought". Klausen v. Sidney Printing & Publishing Co., 271 F.Supp. 783, 784 (D.Kan.1967). See also Hoffman v. Wilson Line, Inc., 7 F.R.D. at 74. The detail in the complaint specifies the necessary relevance of the interrogatories. In re Folding Carton Antitrust Litigation, 83 F.R.D. at 254, McClain v. Mack Trucks, Inc., 85 F.R.D. at 57. The burden now falls upon GAF, the party resisting discovery, to clarify and explain its objections and to provide support therefor. Gulf Oil Corp. v. Schlesinger, 465 F.Supp. 913, 916–17 (E.D.Pa.1979), In re Folding Carton Antitrust Litigation, 83 F.R.D. 260, 265 (N.D.Ill.1979), Robinson v. Magovern, 83 F.R.D. 79, 85 (E.D.Pa.1979), Flour Mills of America, Inc. v. Pace, 75 F.R.D. 676, 680 (E.D.Okl.1977). The number and detailed character of interrogatories is not alone sufficient reason for disallowing them unless the questions are "egregiously burdensome or oppressive". Wirtz v. Capital Air Service, Inc., 42 F.R.D. at 643. See also Anderson Co. v. Helena Cotton Oil Co., 117 F.Supp. 932, 941 (E.D.Ark.1953). Nor is the fact that answering the interrogatories will require the objecting party to expend considerable time, effort and expense, Wirtz v. Capital Air Service, Inc., 42 F.R.D. at 643, or may interfere with defendant's business operations. In re Folding Carton Antitrust Litigation, 83 F.R.D. at 254. See also Klausen v. Sidney Printing & Publishing Co., 271 F.Supp. at 784, Rogers v. Tri-State Materials Corp., 51 F.R.D. 234, 245 (N.D.W.Va. 1970), Cf. In re United States Financial Securities Litigations, supra (interrogatories three hundred eighty-one pages long

and two inches high containing almost three thousand questions and costing over twenty-four thousand dollars to answer held unduly oppressive); Alexander v. Rizzo, 50 F.R.D. 374 (E.D.Pa.1970) (objections to interrogatories denied even though answering would require hundreds of employees many years and hours to "unearth" answers. Krantz v. United States, 56 F.R.D. 555 (W.D.Va.1970) (fifteen hundred interrogatories held oppressive), Frost v. Williams, 46 F.R.D. 484 (D.Md.1969) (two hundred interrogatories held oppressive), Breeland v. Yale and Towne Manufacturing Co., 26 F.R.D. 119 (E.D.N.Y.1960) (two hundred interrogatories held oppressive). General objections without specific support may result in waiver of the objections. In re Folding Carton Antitrust Litigation, 83 F.R.D. at 264. In most instances GAF has failed to so elaborate, and the objection to Interrogatory Three is typical.

In Interrogatory Number Four plaintiff seeks to determine the nature and extent of GAF's advertising, if any, in which GAF claimed safety and efficacy of products.[4] Plaintiff has alleged that GAF made false claims about the safety of a product which plaintiff avers in unreasonably dangerous and ultrahazardous. The relevance of this interrogatory to plaintiff's claim is obvious.

In Interrogatory Number Five plaintiff seeks to determine whether defendant ever advised ultimate product purchasers or users of potential cancers or other diseases possibly contractable by use of or exposure to GAF products.[5] GAF specifically claims that the portion of the interrogatory "that your products could cause cancer, asbestosis and other serious diseases" is argumentative, presumptive and conclusory. However, the first part of plaintiff's question simply requires an affirmative or negative response. Did GAF specifically inform purchasers or users of its products that the product could cause cancer? If the products carried no such warning, the appropriate response would be "no", and no conclu-

---

**4.** See Appendix, infra at 304.

**5.** See Appendix, infra at 304.

sion or assumption could be drawn from that answer alone that the products caused cancer. If the products did carry such a warning, plaintiffs are entitled to know exactly what warning appeared on the products. That an interrogatory may contain an element of conclusion is not objectionable on this ground alone, for allegations of negligence in a tort complaint typically teem with legal conclusions which are not *ipso facto* objectionable or excludable. *Lance v. Ginsburg*, 32 F.R.D. 51, 52 (E.D.Pa. 1962).

 In Interrogatory Number Six plaintiff seeks identification of all labelling and/or relabelling agreements between GAF and third parties as defined by the instructions to the interrogatories.[6] In view of plaintiff's allegations of a conspiracy among GAF and other defendants to produce products without labels or with deceptive ones, the relevancy of this information seems clear. That answering the interrogatory requires investigation will not support denying plaintiff's access thereto when GAF has not shown how or why the investigation will be unreasonable. *Rogers v. Tri-State Materials Corp.*, 51 F.R.D. at 245, *Klausen v. Sidney Printing & Publishing Co.*, 271 F.Supp. at 784.

 In Interrogatories Number Seven through Nine plaintiff seeks to discover the chain of distribution in which GAF engaged and/or its suppliers of asbestos products.[7] Alternatively, if GAF does not manufacture or produce asbestos, plaintiff desires information concerning its duties within the commercial chain of distribution. GAF objects to the vagueness and ambiguity of plaintiff's terms "chain of distribution" and "with which you had business contact". Since plaintiffs have not assigned a particular meaning to these phrases, the ordinary, everyday usage and meaning must have been intended.[8] *Cf. Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976)

(word in Securities Act interpreted by its "common accepted meaning"); *Burns v. Alcala*, 420 U.S. 575, 580–81, 95 S.Ct. 1180, 1184, 43 L.Ed.2d 469 (1975) ("words used in a statute are to be given their ordinary meaning") (Social Security Act); *Banks v. Chicago Grain Trimmers Association*, 390 U.S. 459, 465, 88 S.Ct. 1140, 1144, 20 L.Ed.2d 30 (1968) ("[i]n the absence of persuasive reasons to the contrary, we attribute to the words of a statute their ordinary meaning") (compensation statute); *Malat v. Riddell*, 383 U.S. 569, 571, 86 S.Ct. 1030, 1032, 16 L.Ed.2d 102 (1966) ("words of statutes . . . should be interpreted where possible in their ordinary, everyday sense") (revenue statute). Specifically, in Interrogatory Number Eight, asking GAF to identify its distributors and/or suppliers of raw asbestos, asbestos cement and other asbestos products "with which you had business contact", plaintiff essentially seeks information about any asbestos-type products which GAF has dealt with commercially. In Interrogatory Seven, requesting identification of the "distribution chain" plaintiff simply asks GAF to identify the original source of asbestos and to trace its commercial progress therefrom to GAF and to state to whom GAF sends products once it has completed its process. The requirement that interrogatories be definite is satisfied so long as it is clear what the interrogatory asks. *Struthers Scientific & International Corp. v. General Foods Corp.*, 45 F.R.D. 375, 379 (S.D.Tex.1968). Both phrases which plaintiff used are sufficiently comprehensible in order to allow GAF to respond meaningfully.

In Interrogatories Number Ten through Thirteen plaintiff seeks to discover, in addition to the commercial status of GAF, whether GAF has ever possessed knowledge concerning the alleged connection between exposure to asbestos or asbestos products and several particular diseases, and if GAF so knew, to describe what steps, if any,

---

**6.** See Appendix, *infra* at 304.

**7.** See Appendix, *infra* at 304–305.

**8.** If plaintiff attributes a different meaning to these words, he shall promptly inform defendant.

GAF took as a result.[9] GAF's arguments against answering these interrogatories mirror ones addressed by GAF to Interrogatories Seven through Nine. Accordingly, the reasons articulated immediately above dispose of GAF's objections to these interrogatories as well.

In Interrogatories Number Fourteen through Sixteen plaintiff seeks to elicit whether GAF educated anyone as to the reported dangers resulting from working with and exposure to asbestos and certain enumerated diseases.[10] More specifically, the interrogatories seek to determine when and if GAF has ever been aware that insulators and contractors working inside and outside of confined areas might be subjecting themselves to diseases and other health hazards by using or exposing themselves to asbestos or asbestos products. GAF objects to Interrogatory Fourteen as presumptive and conclusory. However, in light of plaintiff's allegations, defendant cannot avoid answering this interrogatory because the question presumes hazardous conditions or the necessity of safety precautions. If GAF did not inform insulators and customers of any hazards, GAF should so state. At this point in time, before plaintiff has proven any causal connection between his alleged condition and working with asbestos, no adverse inference can be drawn. If GAF did provide such a warning, plaintiff is entitled to know exactly what the warning said.

Although the remainder of GAF's objections to these interrogatories run in a similar vein, GAF complains that answering Interrogatory Sixteen requires expert medical opinion. However, a simple yes or no answer will suffice for most subsections of the interrogatory, and if the answer is yes, GAF should explain. The question is clearly prefaced with "*if* you have knowledge or information", and if GAF does not, a simple negative response will suffice. Fed.R.Civ.P. 26(b)(4)(A) sanctions discovery of "facts known and opin-

ions held" by experts whom the opposing party expects to call at trial. If an expert who will not testify at trial has been retained by the opposing party, the "facts known or opinions held" by the expert may be discovered as provided in Fed.R.Civ.P. 35(b) or "upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means". Fed.R.Civ.P. 26(b)(4)(B). Accordingly, if GAF has knowledge of the matters requested in Interrogatory Sixteen and has employed experts whom GAF expects to call at trial, the interrogatory should be answered. If GAF has knowledge of the matters requested in the interrogatory and has employed experts whom GAF does *not* expect to call at trial, the interrogatory should be answered anyway, for this information is directed at learning the extent of GAF's knowledge of asbestos and asbestos-related diseases, which affects the very nub of plaintiff's contention that GAF had and knew of a duty to protect plaintiff but breached it nonetheless.[11] Opinions of causal connection in a negligence action may be discovered. *Rogers v. Tri-State Materials Corp.*, 51 F.R.D. at 245, *Kerr-McGee Corp. v. Texas Oklahoma Express, Inc.*, 43 F.R.D. 336, 337–38 (W.D.Okl. 1967), Fed.R.Civ.P. 33(b). Moreover, GAF has not suggested a practicable alternative method by which plaintiff can obtain this information. The circumstances, therefore, must be considered "exceptional".

Additionally, GAF complains that the terms "inside" and "outside" used in Interrogatory Fifteen lack precise definitions and as such preclude intelligible responses. Without a more specific definition of "inside" and "outside" insulators and contractors by plaintiff, the ordinary meaning of the terms again must be presumed. If this interpretation does not imbue the words with meaning, plaintiff shall forthwith clarify and explain to GAF exactly what he means by these terms.

---

9. See Appendix, *infra* at 305.

10. See Appendix, *infra* at 305–306.

11. However, defendant need not answer this interrogatory with respect to experts informally consulted. See *infra* at 306.

In Interrogatories Number Seventeen through Twenty-two plaintiff seeks to elicit GAF's knowledge of findings of governmental agencies relating to potential health hazards associated with asbestos and asbestos products and what procedures (such as medical examination programs, financing of laboratory results) GAF followed.[12] Since GAF did not employ plaintiff, GAF argues, he is not entitled to information concerning GAF's plant. However, in view of plaintiff's allegations that plaintiff handled products which flowed through GAF in a chain of distribution or manufacture, this information may be relevant or *may lead to* relevant information. This "may lead to" requirement means only that the request have a reasonable possibility of leading to admissible evidence. *Bogaev v. Murta, Appleton Co.*, 18 F.R.D. 437, 438 (E.D.Pa.1958), *Kraft v. Washington and Jefferson College*, 11 F.R.D. 103, 104 (W.D.Pa.1951). To deny an interrogatory of this type would thwart the purposes of the Federal Rules of Civil Procedure and would "enthrone theoretical considerations of logical symmetry above the practical requirements of everyday litigation", *Hartsfield v. Gulf Oil Corp.*, 29 F.R.D. 163, 165 (E.D.Pa.1962). In the case at bar to conclude now that the requested information is clearly irrelevant or has no possible bearing on the subject matter defeats the "no surprise" animating spirit of federal discovery rules. *See Miller v. Doctor's General Hospital*, 76 F.R.D. at 136. GAF also submits that requiring GAF to answer that part of the interrogatory exploring the programs sponsored by GAF's insurance carrier requires GAF to provide information "which is not and cannot be in the knowledge or control of this Defendant". If, indeed, this statement accurately describes the situation, then GAF should simply state that it has no such knowledge. The expedition which accompanies cooperation of this kind is demonstrated readily by GAF's answer to Interrogatory Eighteen, which inquired of any tests performed by GAF and examining the relationship between asbestos exposure and asbestos-related diseases. GAF answered this interrogatory "GAF did did not cause any tests or studies to be done or receive any results therefrom". A negative response by GAF to this part of the interrogatory will end the inquiry as far as its insurance carrier is concerned.

In Interrogatories Number Twenty-three through Twenty-six plaintiff seeks to determine the extent and nature of GAF's knowledge and relationship with one Dr. Irvin J. Selikoff and the Mount Sinai School of Medicine and whether GAF ever made its employees and others aware of the information and studies conducted by Dr. Selikoff since 1963.[13] "Familiar with", a term used by plaintiff in Interrogatory Twenty-three, is impermissibly vague, argues GAF. However, the term as used certainly seems to ask GAF whether it *knew of* Dr. Selikoff and his work. If GAF did, it should so state.

GAF also objects to part of Interrogatory Twenty-five, which requests GAF to identify documents or agreements between GAF and Dr. Selikoff, Mount Sinai, defendants and any other trade associations, corporations or other business entities and relating to scientific research, data, findings and opinions. GAF resists answering this question on the grounds that it requires GAF to supply information relating to other companies and entities and existing beyond its control and knowledge. Obviously, subsection (c) of this interrogatory does not expect GAF to investigate and report on agreements executed among other defendants or between other defendants and Dr. Selikoff. Rather, the interrogatory requests GAF to identify documents or agreements into which GAF entered. Nowhere does the interrogatory suggest that GAF identify documents executed by parties other than GAF.

In Interrogatories Number Twenty-seven through Thirty-five plaintiff requests names of GAF's presidents or chief executive officers, medical directors or directors

---

**12.** See Appendix, *infra* at 306–307.

**13.** See Appendix, *infra* at 307–308.

of research and development, identification of all trade organizations, associations or other entities to which GAF has belonged, corresponded with or received materials from relating to certain specifications of asbestos products and warnings thereon. Plaintiff also seeks to determine any and all agreements between GAF and other defendants regarding various aspects of asbestos production, warnings or caution labels, dissemination of information and safety equipment available for GAF's own employees.[14] GAF's objection to these interrogatories is the routine "oppressive and burdensome". However, as noted above, GAF must demonstrate how or why answering these interrogatories will be oppressive or burdensome. In light of plaintiff's allegations, the answers will probably be relevant or certainly calculated to lead to relevant evidence.

In Interrogatories Thirty-six through Forty-three plaintiff seeks to discover whether medical personnel employed by or associated with GAF ever made any suggestions relating to potential health hazards associated with exposure to and use of asbestos and asbestos-related products. Additionally, plaintiff desires to know to which scientific or medical periodicals GAF subscribes and what knowledge, if any, GAF has of disability, workmen's compensation or third-party claims for diseases allegedly engendered by exposure to and handling of asbestos and asbestos products.[15] Besides the routine objections GAF complains that the questions dealing with claims of employees for asbestos-related diseases under workmen's compensation and disability are irrelevant since GAF did not employ plaintiff.[16] Clearly these interrogatories are directed at determining the nature and extent of defendant's knowledge and ability to obtain knowledge of asbestosis-related diseases. Accordingly, the answers are relevant to plaintiff's claims.

In Interrogatories Forty-four through Forty-seven plaintiff seeks to discover the identity of all disability and health insurance carriers or adjusters of GAF between 1925 and the present. In addition, plaintiff seeks to determine the nature and extent of advertising conducted by GAF and relating to its asbestos products. Plaintiff also wants GAF to identify all documents it has produced either in civil actions before governmental or other trade associations, organizations and the like, which discussed or established the possible relationship between asbestos exposure and certain diseases and health hazards.[17] Another interrogatory focuses on negotiations between GAF and labor unions concerning working conditions and safety procedures and measures relating to asbestos products. Once again, these interrogatories are directed at examination and elaboration of GAF's knowledge of asbestos-related diseases. GAF's inexact objections do not refute the relevance of this information.

In Interrogatories Forty-eight through Fifty-three plaintiff seeks names of persons who testified on behalf of GAF for the purpose of proving or defending against claims concerning the effects of exposure to asbestos products before specifically enumerated bodies and agencies. Plaintiff also seeks identification of documents possessed by GAF relating to establishment of certain standards or threshold values for exposure to asbestos and asbestos products, names of all experts GAF has utilized in prior or pending litigation involving alleged hazards associated with exposure to and handling of asbestos and asbestos products.[18] GAF claims privilege as the excuse for not answering the interrogatory asking whether GAF has ever sent counsel or representatives to courses "aimed at defending asbestos cases" and if so to identify the courses. Privilege is, of course, a valid objection to interrogatories. *McClain v. Mack Trucks, Inc.*, 85 F.R.D. at 57, *Miller v.*

14. See Appendix, *infra* at 308–309.

15. See Appendix, *infra* at 309–310.

16. See *supra* at 300.

17. See Appendix, *infra* at 310.

18. See Appendix, *infra* at 310–311.

*Doctor's General Hospital,* 76 F.R.D. 139, *Hawes v. C. E. Cook & Co.,* 64 F.R.D. 22, 26 (W.D.Mich.1974), *vacated and remanded,* 538 F.2d 329 (6th Cir. 1976), Fed.R.Civ.P. 26(b)(1), but the mere claim of the privilege does not justify a refusal to identify properly the information and documents requested by plaintiff. *Miller v. Doctor's General Hospital,* 76 F.R.D. at 139, *McCall v. Overseas Tank Ship Corp.,* 16 F.R.D. 467, 469 (S.D.N.Y.1954), *United States v. 58.16 Acres of Land, more or less in Clinton County, State of Illinois,* 66 F.R.D. 570, 572–73 (E.D. Ill.1975). Rather, the existence of privilege depends on the nature of the claim and the circumstances in which it is made. *Hercules, Inc. v. Exxon Corp.,* 434 F.Supp. 136, 144 (D.Del.1977). If GAF has sent counsel or representatives to such courses, requiring GAF to identify the courses, although not directly relevant to plaintiff's claims, may lead to admissible evidence regarding GAF's knowledge of asbestos product dangers. Plaintiff has not asked GAF what counsel learned at these meetings. Rather, plaintiff simply asked whether GAF sent counsel or representatives to courses, and if so, to identify which ones they attended. An interrogatory may confirm the existence, though not the contents, of information gathered by an attorney in preparation for trial. *LaRocca v. State Farm Mutual Automobile Insurance Co.,* 47 F.R.D. 278, 282 (W.D.Pa.1969), *Cedolia v. C. S. Hill Saw Mills, Inc.,* 41 F.R.D. 524, 527 (M.D.N.C. 1967), *Lance, Inc. v. Ginsburg,* 32 F.R.D. at 52–53, *Harvey v. EIMCO Corp.,* 28 F.R.D. 380, 380–81 (E.D.Pa.1961). The party invoking the privilege defense must show that what it seeks to protect falls therein. *Virginia Electric & Power Co. v. Sun Shipbuilding & Drydock,* 68 F.R.D. 397, 401 (E.D.Pa.1975), *International Telephone & Telegraph Corp. v. United Telephone Corp. of Florida,* 60 F.R.D. 177, 184–85 (M.D.Fla. 1973). GAF has made no such showing.

GAF also argues that "on behalf of" in Interrogatory Fifty-three is too vague. Clearly, in the context of this interrogatory, plaintiff desires the names of expert witnesses in pending or resolved cases in which they testified as GAF's paid witness. What other language plaintiff could have used to be more explicit is not readily apparent.

In Interrogatories Fifty-four and Fifty-five plaintiff seeks to ascertain the identity of present or former GAF employees who testified against GAF in litigation or administrative hearings about diseases and health hazards associated with the use of and exposure to asbestos and asbestos products. Additionally, plaintiff requests GAF to identify any transcripts or notes of testimony engendered thereby.[19] GAF's objections include only the routine ones. Testimony from other lawsuits instigated against GAF by former or present employees to recover for injuries resulting from use of asbestos and asbestos products could hardly be more relevant to plaintiff's claims, and plaintiff tailored this request as narrowly as possible. In *Renshaw v. Ravert,* 82 F.R.D. 361 (E.D.Pa.1979), the plaintiff brought a civil rights action against the city and police officers. The court required answers to plaintiff's interrogatories relating to prior suits or disciplinary proceedings against these officers concerning abuse of lawful authority and the eventual disposition of these matters. In *Dollar v. Long Manufacturing, N. C., Inc.,* 561 F.2d 613 (5th Cir. 1971), the Court of Appeals held that the trial court committed reversible error by refusing to compel answers to interrogatories seeking information about the existence and details of other injuries and deaths resulting from the use of a backhoe which caused the death of plaintiff's decedent, even though some of the other injuries occurred after the decedent's death. These later accidents, the court stated, could not be relevant to defendant's prior knowledge or notice of a defective product, but the information would be relevant to the issue of causation. *A fortiori,* in the case at bar information from other actions instituted against GAF will bear directly on both the issues of prior notice and causation. *See also Culp v. Devlin,* 78 F.R.D. 136 (E.D.Pa.1978) (where plaintiff alleged that

**19.** See Appendix, *infra* at 311–312.

mayor and police commissioner negligently failed to give police officers adequate training and supervision designed to avoid police brutality and to ferret out inherently dangerous proclivities of prospective officers, interrogatories requesting information about prior reports received by defendants and alleging police brutality and the eventual disposition thereof must be answered even though the interrogatories were not limited to the particular officers involved), *Shang v. Hotel Waldorf Astoria Corp., supra* (in an action to recover for loss of stolen jewels from defendant's hotel interrogatories requesting number of reported thefts of guest property at hotel for the preceding year were relevant to question of defendant's knowledge of potentially unsafe conditions), *Bowen v. Whitehall Laboratories, Inc.*, 41 F.R.D. 359, 360 (S.D.N.Y. 1966) ("[p]rior complaints could conceivably aid plaintiff to establish that defendant had knowledge of the dangerous nature of the product and possibly lead to the discovery of other evidence relating to the product's effect on its users.") True, some dissimilarities may exist between products used by plaintiff and other employees, but the present record does not divulge what those differences are or whether they are material differences clearly relevant to the subject matter issues of notice and causation. *Swain v. General Motors Corp.*, 81 F.R.D. 698 (W.D.Pa.1979).

Finally, in Interrogatories Fifty-six and Fifty-seven plaintiff seeks to identify experts and GAF employees whom GAF intends "to call or otherwise utilize in connection with this litigation".[20] GAF admits that it has not yet determined what experts or employees it expects to call as trial witnesses but objects to identifying experts whom it utilized in preparation for litigation and trial. If GAF has not decided whom it will call at trial, it cannot presently answer this interrogatory honestly. However, GAF has an obligation to provide this information when the decision is made. *Price v. Lake Sales Supply R.M., Inc.*, 510 F.2d 388, 394 (10th Cir. 1974), *Cleo Wrap*

*Corp. v. Elsner Engineering Works*, 59 F.R.D. at 389, *Rogers v. Tri-State Materials Corp.*, 51 F.R.D. at 244–45, Fed.R.Civ.P. 26(e).

However, plaintiff is entitled to know the identity of experts whom GAF "retained or specially consulted" in preparing for trial, even if GAF does not intend to call them as witnesses, for

> Fed.R.Civ.P. 26(b)(1) permits a party to discover "the identity and location of persons having knowledge of any discoverable matter". Experts, whether or not they will be called to testify at trial, are not exempted from that subdivision. *Baki v. B. F. Diamond Construction Co.*, 71 F.R.D. 179 (D.Md.1976); *Sea Colony, Inc. v. Continental Insurance Co.*, 63 F.R.D. 113 (D.Del.1974) . . . . [However,] *Baki* specifically limits permissible discovery to the identity of experts "retained or specially employed" by a party. . . . Identifying information concerning experts informally consulted, but not retained or specially employed, is not discoverable.

*Arco Pipeline Co. v. S/S Trade Star*, 81 F.R.D. 416, 417 (E.D.Pa.1978). *See also In re Folding Carton Antitrust Litigation*, 83 F.R.D. 256, 259 (N.D.Ill.1979).

■ In light of plaintiff's panoply of allegations his interrogatories have been tailored carefully to establish both the nature and extent of GAF's knowledge of the interrelationship between handling asbestos products and asbestos-related diseases and what GAF did in connection therewith. Clearly this information relates to any duty GAF may have had to refrain from manufacturing or distributing unreasonably dangerous or ultrahazardous goods and whether GAF breached that duty. In a nutshell these interrogatories aim at establishing notice and causation. The exactitude of discovery, the lawyer's tool for factfinding, properly lies somewhere between the acuity of the surgeon's scalpel and the carpenter's hammer. Ideally, the lawyer probes for facts with the precision and delicacy of a

---

**20.** See Appendix, *infra* at 312.

cardiologist incising the aorta to receive a by-pass vehicle. Realistically, the lawyer's factfinding search shares a closer propinquity with the carpenter's trade and pounds much more bluntly. Balancing the one party's need for discovery against the other party's burden in producing it requires honing the need as narrowly as possible to prevent unreasonable burden. *Superior Coal Co. v. Ruhrkohle, A. G.*, 83 F.R.D. 414, 422 (E.D.Pa.1979). In the case at bar plaintiff has attained this desideratum artfully. The magistrate granted plaintiff's motion to compel, and his order is not contrary to law or an abuse of discretion, *Citicorp v. Interbank Card Association*, 478 F.Supp. 756, 765 (S.D.N.Y.1979), *Superior Coal Co. v. Ruhrkohle, A. G.*, 83 F.R.D. at 422, 28 U.S.C. § 636(b)(1)(A). Accordingly, the order of the magistrate will be affirmed and plaintiff's motion to compel will be granted.

### APPENDIX

1. Identify the registered name of answering defendant, as well as all prior names or predecessor entities by which defendant has existed.

2. Identify all divisions, subsidiaries or affiliated companies to answering defendant, having any function which now or in the past engaged in any phase of mining, manufacturing, sale supply or distribution of asbestos or asbestos products. With respect to each of such divisions, subsidiaries or companies, identify the nature and extent of such functions during the relevant periods of time in which such activities have or had occurred.

3. Identify each and every asbestos product, from 1925 to the present, which answering defendant manufactured, processed, compounded, converted, sold, supplied or distributed. With each such product:

(a) State in which phase of commerce defendant engaged;

(b) State during what period of time such product has been associated with defendant;

(c) Identify all sales literature, including brochures, advertisements, pamphlets or other material describing such product, its uses and methods of application or installation;

(d) State how such product was packaged, transported, stored or supplied;

(e) Identify any warning labels, inserts or other writings provided with such product and with every such printed warning, state what period of time it has or had accompanied the product, the exact wording of the warning, any amendments made to the wording, where the warning was located on each product or packaging, and on what asbestos products the warnings appear(ed).

(f) Identify any special instructions provided with such product regarding the use, protection or safety procedures to be employed by Persons handling such product.

4. With respect to your Answer to Interrogatory # 3, did you claim your product(s) to be either safe, effective and/or easy to handle? If so, identify all such Documents, including but not limited to brochures or advertisements (radio, television or printed), and revisions thereof by publication(s) and date.

5. With respect to your Answer to Interrogatory # 3, did you specifically inform the purchaser or user of your products during the same time period that your products could cause cancer, asbestosis, and other serious diseases? If so, identify the Document containing such information by date and location.

6. Identify any and all labelling or relabelling agreements in existence since 1925 between answering defendant and other Persons, including other defendants.

7. Identify the distribution chain of defendant's asbestos products since 1925 along with any Documents evidencing or confirming such chain, including but not limited to distribution from and to other defendants.

8. Identify your distributors and/or suppliers of raw asbestos, asbestos cement and other asbestos products with which you had business contact.

9. As to any answering defendant *not* engaged in some phase of production, state:

(a) Whether defendant is or was a supplier, distributor or contractor of asbestos products;

(b) For which of the other defendants answering defendant engaged in such activities;

(c) Over what period of time and in what geographical area such activities were conducted;

(d) With which asbestos products were answering defendants involved in such activities;

(e) What warnings, safety procedures or methods were employed by answering defendants to protect persons against hazards from exposure to said asbestos or asbestos products.

10. As to any answering defendant engaged, inter alia, in production, state:

(a) Whether defendant is or was a supplier, distributor or contractor of such products;

(b) For which of the other defendants answering defendant engaged in such activities;

(c) Over what period of time and in what geographical area such activities were conducted;

(d) With which asbestos products were answering defendants involved in such activities;

(e) What warnings, safety procedures or methods were employed by answering defendant to protect persons against hazards from exposure to said asbestos or asbestos products.

11. Is answering defendant aware or possessed of knowledge concerning the reported causal connection between exposure to asbestos or asbestos products and:

(a) asbestosis?

(b) lung cancer?

(c) mesothelioma?

(d) other cancers?

12. If your answer to Interrogatory # 11, as to any or all of its subparts, is the affirmative, Identify:

(a) When and how defendant *first* learned of such connection;

(b) If knowledge was obtained by attendance at any conference, lecture, convention, symposium or meeting, Identify such meeting and provide identity of Persons attending or Documents obtained;

(c) If knowledge was obtained from medical or scientific studies, or any other published work, Identify same;

(d) If otherwise obtained, identify manner of receipt of Document or communication.

13. With regard to any knowledge obtained *subsequent* to that identified in your answer to Interrogatory # 12(a) above, *identify*:

(a) All Documents or other communications, oral or written, concerning the causal connection between exposure to asbestos or asbestos products and disease, and identity of Persons so communicating;

(b) Did answering defendant obtain from or transmit any such information to other defendants in this case? If so, *identify*:

(1) manner of receipt or communication for each contact;

(2) all Documents and persons involved.

14. As to any knowledge possessed by answering defendant at any time referred to in your answers to Interrogatories # 11, # 12 and # 13, did you educate your employees, distributors or purchasers of the hazards known to you and the safety precautions necessary to guard against cancer and other diseases arising from the use and handling of your products? If so, *identify*:

(a) When and in what manner customers, insulators, factory workers and the general public were so informed;

(b) Documents communicating or otherwise disseminating such information;

(c) Programs initiated or sponsored to establish or promote safety procedures, methods or usage of equipment;

(d) Published articles or reports by employees (present or prior), including those of

medical directors, scientists, engineers or other professionals;

(e) Symposia or lectures sponsored for the benefit of asbestos workers and/or the general public.

15. When and by what manner were you first aware of the hazards relating to exposure to asbestos or asbestos products:

(a) For inside insulators and contractors;

(b) For outside insulators and contractors.

16. If you have knowledge or information concerning the following, answer in the affirmative or negative, whether:

(a) Early detection of mesothelioma results in any appreciable rate of cure or arrest;

(b) A single exposure to asbestos may cause mesothelioma, other cancers, or asbestosis;

(c) Cumulative or multiple exposures to asbestos result in a greater risk of harm to the exposed person;

(d) An outside insulator has a risk of harm from exposure to asbestos or asbestos products;

(e) Stripping or removing old asbestos creates a greater risk of harm than installation of asbestos or asbestos products;

(f) Cancer resulting from exposure to asbestos develops generally after:

(1) 1–5 years

(2) 6–10 years

(3) 11–20 years

(4) more than 20 years

(g) There is any known relationship between smoking and mesothelioma;

(h) There is any reported cause of mesothelioma other than exposure to asbestos.

17. As to each answer to Interrogatory # 16, identify at least *one* Person or Document upon which answering defendant relies.

18. Did you perform, direct to be performed, finance, sponsor or receive the results of any studies or tests concerning the relationship between asbestos exposure and asbestosis and/or cancer? If so, *identify*:

(a) When, where, and at what intervals such studies were performed;

(b) Were such studies in writing or reported at a later date in writing;

(c) Were the results of such studies published or otherwise disseminated? If so, state to whom and when;

(d) Who performed such studies;

(e) Will you produce the results of such studies at this time, or state where the results are maintained.

19. Have any findings been made by any governmental agency, body, commission or health organization, including but not limited to the U.S. Public Health Service, OSHA or NIOSH, concerning specific hazards associated with the use and handling of asbestos and asbestos products in plants or on job sites owned or controlled by you, any restrictions in use of same, requirements for medical surveillance and examinations for your workers, dust monitoring, or availability of safety equipment, all of which were aimed at determination of the degree of exposure to asbestos or asbestos products which would not cause disease among employees, and at the prevention or limitation of inhalation or consumption of asbestos fibers or dust in connection with the insulation process? If such findings were made, *identify*:

(a) The date or dates of such findings and by which organization or entity such findings were made;

(b) The form in which such findings were made and, if written, the exact wording of same or location in regulation, order, bulletin, report or other writing;

(c) What steps were taken to comply with such findings and the dates when such acts of compliance occurred;

(d) How insulators or installers were informed of such findings and if such information was written identify same.

20. Did you perform, direct to be performed, finance, sponsor or receive the results of any dust monitoring tests at job sites where asbestos or asbestos products

were being applied and/or removed by insulators? If so, *state*:

(a) The date and location of the *first* such test;

(b) When, where and at what intervals subsequent tests were performed;

(c) Who performed such tests;

(d) Where the results of such tests are maintained;

(e) What steps were taken by you to improve results of such tests, and dates when such improvements were made.

21. If your answer to the above Interrogatory is in the negative, state your reasons for not performing dust monitoring tests.

22. Identify any medical examination programs offered or sponsored by answering defendant or its insurance carrier(s) for employees handling or otherwise exposed to asbestos and asbestos products. With respect to each such program, state:

(a) Manner of communicating with employees about such program;

(b) Whether examination was mandatory or optional;

(c) What percentage of workers permitted to undergo such examination participated;

(d) What percentage of workers were found to have asbestosis or mesothelioma;

(e) With respect to (d), what percentage of such workers were paid disability or workmen's compensation benefits or for whose benefit medical expenses were paid to undergo treatment for such conditions.

23. Is answering defendant familiar with Dr. Irving J. Selikoff and/or The Mt. Sinai School of Medicine? Is so, state:

(a) Approximate date and manner of obtaining such familiarity;

(b) Whether any employee or representative of defendant attended a lecture or oral presentation at which Dr. Selikoff spoke on the relationship between asbestos and cancer or asbestosis.

24. Did answering defendant (or its insurance carrier) ever send its employees handling or otherwise exposed to asbestos and asbestos products to be examined by Dr. Selikoff or Mt. Sinai personnel? If so, state:

(a) Dates of such examinations;

(b) Whether answering defendant received the results of such examinations;

(c) Whether answering defendant's insurance carriers received the results of such examinations;

(d) *Identify* all Documents authored or summarizing Dr. Selikoff's reports or findings which you have in your possession or control.

25. If your answer to Interrogatory # 23 is in the affirmative, *identify*:

(a) All communications, either written or oral, received by you from or transmitted by you to Dr. Selikoff and/or Mt. Sinai prior to the publication of Dr. Selikoff's article, "Asbestosis Exposure and Neoplasia," *JAMA 188*:142 (1963), regarding the relationship between asbestos exposure and disease;

(b) All communications, either written or oral, received by you from or transmitted by you to Dr. Selikoff after 1963, regarding the relationship between asbestos exposure and disease;

(c) All Documents, including but not limited to preliminary and/or executed agreements, between you, Dr. Selikoff, Mt. Sinai, any of the defendants in this matter and/or any trade associations, corporations or other business entities, relating to, inter alia, scientific research or studies to be performed, equipment and/or funding to be supplied, publication or non-publication of data, results, findings and/or opinions.

26. With respect to those medical programs identified in defendant's answers to Interrogatories # 22 and # 24, state:

(a) Whether defendant had a written or unwritten policy that the results of such medical examinations should not be revealed to defendant's employees;

(b) If your answer to subpart (a) above is in the affirmative, did such policy extend to those employees whose medical examina-

tions revealed evidence of asbestos-related diseases, including but not limited to asbestosis and mesothelioma;

(c) If such policy was or is written, identify all doctors, clinics, associations and personnel associated with defendant who were instructed as to defendant's policy;

(d) Whether there is a central repository where the results of such medical examinations or studies are located;

(e) Whether defendant's policy included instructions to disclose results of medical examinations to the personal physicians of employees, or others;

(f) Whether defendant performed, financed or assisted in performing medical examinations on employees of other defendants named in this lawsuit. If the answer is in the affirmative, list the name(s) of such defendant(s);

(g) Whether defendant performed, financed or assisted in performing medical examinations on employees of other corporations or business entities not named as defendants in this lawsuit. If the answer is in the affirmative, list the name(s) of such corporation(s) or business entities.

(h) *Identify* all Documents or agreements setting forth conditions under which such programs were to be performed and instructing the examiner(s) as to (non-)disclosure of results.

(i) Whether answering defendant admits or denies any policy of nondisclosure, have any medical or other corporate personnel employed by defendant now or in the past ever testified as to the existence of such policy of nondisclosure. If so, identify the witness, the date, the proceeding, and the existence of any transcripts, notes of testimony or sworn statements of such witnesses.

27. Did you, since 1925, or do you now maintain a medical director or director of research and development? If so, *Identify* and state the duties and responsibilities of the position and to whom in the corporate structure the director reports.

28. Identify *all* Presidents or chief executive officers employed by you or any of your predecessors from 1925-present.

29. Identify all trade organizations, associations, or other entities, including but not limited to A.T.I., I.H.F., N.I.M.A., A.I.A., N.I.C.A., T.I.M.A., Q.A.M.A., P.I.C.A. or Q.A.P.A., to which you have belonged or in which you have participated since 1925.

30. Identify all persons attending on your behalf any meetings held by trade organizations, associations, or other entities identified in answer to Interrogatory # 29.

31. Identify the names or nature of all notes, reports, studies, or other writings submitted by you or received by you at meetings identified in answer to Interrogatory # 30.

32. Identify any Documents received by you from or submitted by you to those trade organizations, associations or other entities identified in answer to Interrogatory # 29 relating to the relationship between asbestos exposure and disease.

33. Identify all agreements, oral or written, between you, any of the other defendants in this lawsuit, and/or any other organizations, associations or other entities identified in your answer to the preceding interrogatory or any medical or scientific foundations, relating to the standardization of:

(a) Specifications for asbestos cloth products;

(b) Specifications for paper or burlap bags, or other packaging to be used for the transport and/or storage of asbestos cement;

(c) Warning or caution labels to be applied to asbestos products and/or their packaging, cartons, containers, or boxes;

(d) Methods of dissemination of public relations information to defendant's purchasers, advertisers, distributors, factory workers, contractors, insulators, users, consumers of asbestos products and/or the general public;

(e) Safety equipment and/or protective clothing to be utilized while handling defendant's asbestos products.

(f) Medical programs to be offered or sponsored by defendant.

34. Did you direct to be performed, sponsor, finance or receive the results of any studies or tests performed by the Saranac Lake Laboratory of the Trudeau Foundation relating to asbestos exposure and its effects upon human life? If so, *Identify*:

(a) All Documents summarizing findings or results of those studies or tests which you have in your possession or control;

(b) All communications, oral or written, between answering defendant and Saranac personnel, including but not limited to Gerrit W. H. Schepers, M. D.;

(c) All Documents relating to Saranac studies received or submitted by you either directly, through associated or predecessor companies, through other companies, or through any trade associations, organizations or other entities.

(d) All recommendations or findings of such studies relating to:

(1) adequacy or inadequacy of threshold limit values;

(2) substitution of materials other than asbestos to be used in the insulation process.

(e) Where Documents and/or communications identified in answers to (a)–(d) of this Interrogatory are maintained.

35. Identify all physicians who were employed, retained or otherwise engaged by answering defendant at any of its facilities from 1925 to the present.

36. Did any of defendant's medical directors identified in answer to Interrogatory # 27, physicians identified in answer to Interrogatory # 35, or other corporate personnel ever make, at any time, recommendations or suggestions to defendant pertaining to the risks of hazards to persons using, handling or being exposed to defendant's asbestos products? If so, state:

(a) When such recommendations or suggestions were made;

(b) To whom and by whom were such recommendations or suggestions made;

(c) Whether such recommendations included:

(1) implementation of dust monitoring programs;

(2) structural modifications of existing ventilation systems and/or installation of new ventilation equipment;

(3) provision of separate locker facilities and/or protective equipment or clothing for defendant's employees or other persons using, handling or being exposed to defendant's asbestos products;

(d) Whether employment of any of defendant's medical directors, physicians or other corporate personnel was terminated for reasons other than retirement, disability or death. If so, for what reasons?

37. Identify the scientific or medical periodicals to which defendant, its medical department or industrial hygiene division subscribed from 1925 to the present, and the dates of such subscriptions.

38. Did defendant, its medical department or industrial hygiene division maintain a medical and/or scientific library at any time from 1925 to the present? If so, *state*:

(a) The dates such library existed;

(b) The number of volumes maintained therein;

(c) The number of employees, part-time or full-time, assigned to maintenance of said library, and to whom in the corporate structure those employees report(ed).

39. Has any employee of answering defendant ever made a claim for asbestosis under the Occupational Disease or Workmen's Compensation Statute of any State? If so, state:

(a) The date that defendant first received notice of any such claim;

(b) The total number of such claims per year received to date;

(c) The number of such claims for which disability benefits and/or medical expenses were paid by defendant.

(d) *Identify* all Persons to whom disability benefits and/or medical expenses were paid by defendant and the exact medical diagnosis, disease and/or condition for which such benefits/expenses were paid.

40. Has any employee of answering defendant ever made a claim for mesothelioma, lung and/or other cancers alleged to be related to asbestos exposure under the Occupational Disease or Workmen's Compensation Statute of any state? If so, state:

(a) The date that defendant first received notice of any such claim;

(b) The total number of such claims per year received to date;

(c) The number of such claims for which disability benefits and/or medical expenses were paid by defendant;

(d) *Identify* all Persons to whom disability benefits and/or medical expenses were paid by defendant and the exact medical diagnosis, disease and/or condition for which such benefits/expenses were paid.

41. How many employees of answering defendant are known by defendant to be suffering from, have suffered from or whose deaths have been caused by asbestosis? State the date such disease of any employee was first known by defendant.

42. How many employees of answering defendant are known by defendant to be suffering from, have suffered from or whose deaths have been caused by lung cancer? State the date such disease of any employee was first known by defendant.

43. How many employees of answering defendant are known by defendant to be suffering from, have suffered from or whose deaths have been caused by mesothelioma? State the date such disease of any employee was first known by defendant.

44. *Identify* all of defendant's compensation, disability and/or health insurance carriers or adjusters from 1925 to the present. With respect to each, *state*:

(a) Dates of coverage;

(b) Whether defendant's insurance rates were ever increased due to health hazards associated with defendant's asbestos products and exposure of defendant's employees thereto;

(c) Whether defendant's insurance rates were ever increased as a result of claims submitted for asbestos-related diseases and/or disability;

(d) *Identify* all reports, findings, studies, recommendations, communications or other Documents issued by such carriers or adjusters to defendant relating to defendant's asbestos products and hazards associated with exposure thereto.

45. Identify each and every magazine or trade publication in which answering defendant advertised its asbestos products from 1925 to the present.

46. Did you discuss or consider in any meetings, conventions, conferences, correspondence, memoranda, or any other writing, the costs associated with either making your asbestos products safe or the use thereof less hazardous? If so, identify all such written or oral considerations by date, place and attendance at meetings, or appropriate date, author and recipient of written material associated therewith. Your response should include considerations regarding medical surveillance, physical examinations, establishment of changing areas separate from the insulation area, dust control and monitoring programs, availability of safety equipment and general improvement of working conditions. This Interrogatory requires the identification of not only programs or policies which were instituted, but those which were rejected by you alone or in conjunction with others.

47. Have you ever negotiated with labor unions representing workers handling or working with asbestos or asbestos products concerning working conditions, safety equipment procedures or other protective measures aimed at eliminating or cutting down the risks associated with exposure to such products? If so, identify when such negotiations took place, with what unions, and identify all Documents reflecting such agreements since 1925.

48. Identify all Documents which exist, either in the files of answering defendant or which have been produced in other proceedings or "asbestos litigation," that represent communications between any of the defendants to this suit, other manufacturers, suppliers or distributors of asbestos

products, the United States government, trade organizations, including but not limited to A.T.I., I.H.F., N.I.M.A., A.I.A., N.I.C.A., T.I.M.A., Q.A.M.A., Q.A.P.A. or P.I.C.A., or scientific or medical foundations, such as Saranac Lake Laboratory or Mt. Sinai School of Medicine:

(a) Discussing the possible relationship between asbestos exposure and asbestosis, lung cancer, mesothelioma and/or other diseases;

(b) Medical or scientific studies concerning the relationship between asbestos exposure and asbestosis, lung cancer, mesothelioma and/or other diseases;

(c) Discussing the publication or non-publication of any medical or scientific findings concerning such relationship.

49. Identify all Persons who have testified and all Documents presented or utilized for the purpose of proving or defending against claims concerning the adverse effects upon human life through exposure to asbestos or asbestos products:

(a) In any litigation, pending or otherwise, involving answering defendant;

(b) Before Congressional or OSHA hearings or investigative proceedings of any other governmental agency or unit;

(c) At any symposium, course, lecture or other meeting;

(d) With respect to (a)–(c) above, identify the name of the case, court term and number, or other description of proceedings and/or meeting.

50. With respect to your answer to Interrogatory # 49, *identify*:

(a) Any affidavit or transcript of a deposition, trial or hearing at which answering defendant participated;

(b) Any verdict or settlement resulting in the finding of liability and/or payment of money to claimants alleging personal injury from the exposure to asbestos or asbestos products.

51. Identify all Persons who have testified on your behalf and all Documents presented at or utilized for preparation of testimony at OSHA, NIOSH, Congressional and/or other governmental hearings or investigative proceedings on the subjects of the biological effects on human life of exposure to asbestos and the setting, modification, feasibility and acceptance of allegedly safe or proper levels of such exposure to asbestos and asbestos products. For all such testimony *identify*:

(a) Dates and descriptions of proceedings;

(b) Relationship between Persons testifying and answering defendant, i. e., employee or consultant;

(c) All studies, test results, or other scientific or medical Documents relied upon by said Persons as a basis for any recommendations made or testimony given;

(d) Whether, at any time prior to or following such testimony, you were possessed or knowledge of Documents suggesting that existing or proposed threshold limit values *were not* safe or proper, or that lower threshold limit values were necessary in order to prevent disease. If your answer is in the affirmative, *identify* origin of knowledge and all Documents relating thereto.

(e) Whether, at any time prior to or following such testimony, you were aware that the proper method for determination of safe levels of asbestos was to test concentrations of *fibers* in the air, rather than the total number of *particles*. If your answer is in the affirmative, *identify* origin and said knowledge and all Documents relating thereto.

52. Do you send or have you at any time sent counsel or other representatives to courses aimed at defending asbestos cases? If so, *Identify*.

53. Identify all expert witnesses who have testified in other cases, pending or otherwise, *on behalf of* answering defendant.

54. Identify all present or former employees of answering defendant, other than *plaintiffs*, who have testified *against* answering defendant in a litigation matter or before a governmental agency or unit.

55. With respect to your answers to Interrogatories # 53 and # 54, identify all Documents, including but not limited to transcripts or notes of testimony employed by or resulting from the testimony of such expert witnesses or employees.

56. Identify:

(a) Any expert whom you intend to call as a witness or otherwise utilize in connection with this litigation.

(b) Any co-worker of plaintiff whom you have interviewed or intend to call as a witness in this litigation.

57. If plaintiff was ever employed by answering defendant or worked on a job contracted by answering defendant:

(a) *Identify* any work records, employment records or job records with respect thereto;

(b) *Identify* any invoices, purchase orders or other Documents evidencing the use of a product manufactured by defendant on said job(s);

(c) If answering defendant cannot identify Documents as to (a) and (b) above, confirm or deny the existence and use of defendant's products during the relevant time period;

(d) *Identify* any products not manufactured by, but relabelled or otherwise altered by defendant and used on said job(s).