HARTFORD FIRE INSURANCE COMPANY, a Connecticut Corporation, individually and as a representative class member of Industrial Risk Insurers, an unincorporated association, Plaintiff,

v.

PURE AIR ON THE LAKE LIMITED, PARTNERSHIP, a Delaware limited partnership of Air Products and Chemicals, Inc., a Delaware corporation, et al., Defendants.

No. 2:93–CV–46.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Dec. 13, 1993.

Thomas A. McDonald, James J. Knibbs, Celeste A. Hill, Clausen Miller Gorman Caffrey & Witous, P.C., Chicago, IL, Terrence L. Smith, Smith & DeBonis, East Chicago, IN, for plaintiff.

James Riley, Jr., Mary K. Reeder, Riley Bennett & Egloff, Indianapolis, IN, Richard H. Albert, Air Products & Chemicals, Inc., Allentown, PA, Mark E. Schmidtke, Hoeppner, Wagner & Evans, Valparaiso, IN, for Air Products, First Air Mitsubishi, and Pure Entities.

Joel J. Sprayregan, Shefsky & Froelich, Ltd., Chicago, IL, Leonard E. Eilbacher, Hunt Suedhoff, Borror & Eilbacher, Fort Wayne, IN, for Hunter Corp.

C. Roy Peterson, C. Kevin McCabe, Lord, Bissell & Brook, Chicago, IL, Harold Abrahamson, Abrahamson, Reed & Adley, Hammond, IN, for Thatcher Pile Dyne.

Stephen P. Handler, Stewart W. Karge, McDermott Will & Emery, Chicago, IL, James H. Pankow, Jones, Obenchain, Ford, Pankow & Lewis, South Bend, IN, for Sargent & Lundy.

Roger B. Harris, Altheimer & Gray, Chicago, IL, Joseph Stalmack, Galvin, Stalmack & Kirschner, Hammond, IN, for Edward Gray Corp.

Mark E. Christensen, Callahan & Christensen, Chicago, IL, Peter C. Bomberger, Friedrich, Bomberger, Tweedle & Blackmun, P.C., Highland, IN, for Chicago Underwater.

John Van Buskirk, Rober Maas, Richard Coffman, Stark, Doniger & Smith, Indianapolis, IN, for ATEC.

## MEMORANDUM OF DECISION AND ORDER

COSBEY, United States Magistrate Judge.

## I. INTRODUCTION

This matter is before the court[1] on the Defendants', Pure Air on the Lake Limited Partnership and Pure Air, a Delaware Partnership (collectively, "Pure Air"), "Motion for Protective Order and Motion to Quash Subpoena" (hereafter "Pure Air's Motion") and Memorandum in Support both filed on June 1, 1993. In essence, Pure Air seeks to prevent discovery by all other parties of the "facts known and opinions held" by Packer Engineering ("Packer"), their alleged consulting expert, as well as Packer "documents and materials." See Pure Air's Motion, p. 4.

On June 25, 1993, the Plaintiffs, Hartford Fire Insurance Company and St. Paul Fire and Marine Insurance Company, individually and as representative class members of Industrial Risk Insurers ("IRI") (hereinafter collectively referred to as "Plaintiffs"), filed a response in opposition.

On June 26, 1993, some co-Defendants of Pure Air, specifically, Thatcher Engineering Corporation and Pile Dyne, Inc. (collectively, "Thatcher") filed a Memorandum in Opposition to Pure Air's motion.

On October 8, 1993, Pure Air filed a reply brief together with fifty-three exhibits in support.

On November 1, 1993, another co-Defendant of Pure Air, Chicago Underwater, Inc. ("Chicago Underwater") filed a Memorandum in Opposition to Pure Air's motion. On November 15, 1993, another co-Defendant of Pure Air, the Edward Gray Corporation ("Edward Gray") filed a Memorandum in Opposition to Pure Air's motion. On November 17, 1993, Thatcher filed a Supplemental Brief in Opposition to Pure Air's motion.

On November 18, 1993, the court authorized Pure Air some limited additional briefing which was completed with the filing of their brief on December 6, 1993. With their December 6, 1993, brief Pure Air also submitted 17 supporting exhibits for in camera inspection. The court has reviewed the documents.

This court has jurisdiction by virtue of diversity pursuant to 28 U.S.C. section 1332.

## II. FACTUAL AND LEGAL BACKGROUND

In 1989, Pure Air contracted with NIPSCO Industries, Inc. ("NIPSCO") for the construction and operation of a flue gas desulfurization processing system ("the facility") at NIPSCO's Bailly Generating Station in Chesterton, Indiana. Pure Air then contracted with Hunter Corporation ("Hunter") as the general contractor and Hunter subcontracted with Thatcher to construct coffer dams for two lift stations at the facility.

On July 2, 1991, and after construction of the facility commenced, some underground intake and discharge pipes collapsed while Thatcher was working in their vicinity resulting in a subsurface cave-in, a massive sinkhole, and extensive property damage.

The Plaintiffs, an unincorporated association of insurers, had issued separate insurance policies to both NIPSCO and Pure Air covering the property damage which occurred. On July 3, 1991, attorneys and representatives of the Plaintiffs were present at the construction site for the ostensible purpose of pursuing any possible subrogation claims against third-parties. NIPSCO's and Pure Air's counsel were also present. On that same date counsel for Pure Air approached Plaintiffs counsel to solicit a joint investigation of the collapse by Packer. Plaintiffs' counsel declined for the reason that some adverse interests between the Plaintiffs and Pure Air may result and because they had had no input on selecting Packer.

Pure Air now suggests that by July 3, 1991, it was apparent that massive losses had occurred and that "litigation was inevitable." See Pure Air's June 1, 1993, Memorandum, pg. 2. As a result, and supposedly in anticipation of litigation, Pure Air and NIPSCO agreed to a joint investigation of the collapse by Packer, an engineering firm selected by NIPSCO. Id. at p. 3. Pure Air claims the Plaintiffs refused to participate in the joint

---

1. On October 26, 1993, the Honorable William C. Lee, Judge of the District Court, entered an Order of Reference referring all non-dispositive pre-trial matters in this cause to the undersigned Magistrate Judge pursuant to 28. U.S.C. § 636(b)(1)(A).

investigation because they planned to use, or had already retained, other experts.[2]  *Id.*

The joint agreement between NIPSCO and Pure Air was memorialized by a July 18, 1991, "Joint Investigation Agreement" ("Agreement").  The Agreement provided in part:

> 4.  All information and documentation obtained from the joint investigation and opinions of consultants retained in the joint investigation shall be confidential and the exclusive property of the parties.  No information and documentation *obtained from or opinions of consultants* retained in the joint investigation shall be disclosed, revealed or otherwise disseminated by either party to any person or entity other than an affiliated company (which, with respect to PAL, shall include but not be limited to Pure Air, Air Products and Chemicals, Inc. and Mitsubishi Heavy Industries America, Inc.) or, an employee, officer, director or attorney of the parties without the prior written consent of the other party.

Allegedly, the Plaintiffs were advised of the Agreement and expressed no objection. *Id.* at p. 4.  Moreover, NIPSCO allegedly cooperated with the Plaintiffs and informed them of the progress of the joint investigation, and even invited them to observe.  *Id.* The Plaintiffs supposedly declined.  *Id.*

By all accounts, Packer's investigation was monumental, and consisted of: background research, visual observation, photographs, eye witness statements, and soil/material gathering, testing and analysis.  *Id.* at p. 5. Packer's total expenses ran more than 1.7 million dollars (paid one-half each by Pure Air and NIPSCO).  *See* Pure Air's Final Reply Brief, p. 11 and Exhibit 2, thereto. Packer was not alone, however; for example, it seems clear that the Plaintiffs also had consulting engineers routinely at the site for observing and evaluating the work.  *See* Pure Air's Exhibit 11 to their Reply Brief.

Thatcher also had an investigator working at the site.

Later, the Plaintiffs filed this action against Pure Air and other defendants.  At about the same time the Plaintiffs served interrogatories and requests for production on Pure Air, requesting among other things, the facts, data and information obtained and known by Packer.  Pure Air objected.  *See* Exhibits D and E to the June 1, 1993 Memorandum.

Having met with resistance from Pure Air, the Plaintiffs proceeded to serve a subpoena directly on Packer for essentially the same information.  Packer also objected.  *See* Pure Air's June 1, 1993, Memorandum.

After much briefing, then presiding Chief Judge Sharp[3] entered an order on September 21, 1993, directing the Packer report to "be made available to all parties and counsel in this case INSTANTER."  This sparked a Motion to Reconsider from Pure Air, more briefing, and ultimately the recusal of Chief Judge Sharp.[4]  Pure Air essentially argues that the facts known and opinions held by Packer (together with any underlying supporting materials) are not discoverable because Packer was retained in anticipation of litigation, is a non-testifying expert, and no "exceptional circumstances" exist that would merit disclosure as contemplated within the meaning of Federal Rule of Civil Procedure 26(b)(4)(B).  For essentially the same reasons, it is also urged that the subpoena directed to Packer be quashed because it allegedly seeks confidential research, is unduly burdensome, and is overly broad.  Finally, Pure Air argues that if the court does order production the Plaintiffs (and Pure Air's co-Defendants) ought to pay their fair share of Packer's fees.

The Plaintiffs argue that Packer is at least a factual witness and the facts they know are discoverable, particularly since their disclosure will narrow the issues, minimize costs,

---

2.  The record suggests that eventually most, if not all, parties to this litigation retained consulting experts.

3.  The case has now been reassigned to Judge William C. Lee.

4.  The court has not chosen to recite the full pleading history that has evolved from Pure Air's initial June 1 motion.  *See* Pure Air's "Final Reply Brief" p. 2 n. 1.  Rather, only the most salient filings have been noted.  *See* p. 204, *supra*.

and reduce the time associated with discovery. Moreover, the Plaintiffs argue that Packer was not retained in anticipation of litigation as demonstrated by both the Agreement and the circumstances of this case. The Plaintiffs also assert that the confidentiality provision in the Agreement is invalid, and that Packer's opinions have already been disseminated to the press—waiving any confidentiality or work product privilege. Finally, the Plaintiffs argue that "exceptional circumstances" exist making all of Packer's information and beliefs discoverable within the meaning of Federal Rule of Civil Procedure 26(b)(4)(B).

Thatcher also argues that under the facts of this case "exceptional circumstances," exist requiring production; and Pure Air's labeling of Packer as a "consulting expert" is disingenuous and should be disregarded. Chicago Underwater and Edward Gray also suggest that "exceptional circumstances" exist (particularly as to them) and that the Packer report should be produced. In sum, they carve out a different position from the Plaintiffs in that they allege that they had no opportunity to obtain facts or opinions about the accident prior to the site being changed because they had no idea that claims would be asserted against them until they were actually made parties to this lawsuit.

Thatcher's supplemental brief further objects because they believe that Pure Air is now seeking to bar not only production of the Packer report and opinions but also all witness statements related to the Packer investigation even though not created or compiled by Packer.[5]

Pure Air's Final Reply Brief argues that no "exceptional circumstances" exist because all of the other parties have conducted investigations, they all have information and documentation which can be analyzed as to causation, and at the very most they have articulated only some self-serving and generalized "need" for the Packer information. *See* Final Reply Brief, pp. 7–8. Moreover, Pure Air argues that at a minimum there can be no showing of any "exceptional circumstances" as to Packer's *opinions;* and that only the "facts known" by Packer ought to be produced if anything at all. Finally, Pure Air continues to urge the court to order (if "exceptional circumstances" are found to exist) reimbursement for a fair share of Packer's expenses.

### III. *THE LEGAL FRAMEWORK FOR THIS DISCOVERY DISPUTE*

Federal Rule of Civil Procedure 26 is the beginning reference point for any discovery discussion:

> Parties may obtain discovery regarding any matter, not privileged,[6] which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party ...[.] It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence....

FED.R.CIV.PROC. 26(b)(1). Here, relevancy is not much at issue; rather, the current dispute focuses upon Federal Rule of Civil Procedure 26(b)(4)(B) which now provides:

> (B) A party may, *through interrogatories or by deposition,*[7] discover facts

---

**5.** The Court does not read such a suggestion in Pure Air's motion. The motion seeks a protective order as to the "discovery of facts known and opinions held by Packer and Packer documents and materials ...[.]" *See* Pure Air's motion, p. 4. While the content of witness statements (not compiled by Packer) may be a fact known by Packer it does not mean that these statements are otherwise not discoverable.

**6.** The concept of privilege, or work product, does not apply to the discovery of a consulting expert's opinion. *See*, Notes of Advisory Committee on Rule, 1970 Amendment. *See also, Pearl*

*Brewing Co. v. Jos. Schlitz Brewing Co.,* 415 F.Supp. 1122, 1137 (S.D.Tex.1976).

**7.** Effective December 1, 1993, Fed.R.Civ.P. 26(b)(4)(B) was slightly revised as underscored. Pursuant to an Order of the United States Supreme Court dated April 22, 1993, such revisions to the Federal Rules of Civil Procedure "shall govern all proceedings in civil cases thereafter commenced and, insofar as just and practicable, all proceedings in civil cases then pending." Even if applied here the change is a modest one; in fact, it did not even merit a comment from the Advisory Committee. Nonetheless, Pure Air ar-

known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial who is not expected to be called as a witness at trial, only as provided in Rule 35(b) or upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means.[8]

The workings of the Rule have been summarized:

> To be discoverable under Rule 26(b)(4), the information must be otherwise discoverable under Rule 26(b)(1) and acquired or developed in anticipation of litigation or for trial. In essence, the rule provides that when an expert is expected to testify at trial, discovery from the expert is limited to the expert's opinions and the grounds therefor. The opinions of non-testifying experts are discoverable only on a showing of exceptional circumstances.
>
> Whether an expert's evidence is protected by Rule 26(b)(4) from discovery must be determined in the light of the nature of the documents or testimony sought, and the total factual situation in the particular case. The rule comes into play only if the experts and their information can fairly be said to have been obtained or acquired

because of the prospect of litigation. (footnotes omitted).

2 SHEPARD'S, DISCOVERY PROCEEDINGS IN FEDERAL COURT, § 16.19 (2d ed. 1991).

In essence, the facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of ligation or preparation for trial and who is not expected to be called as a witness at trial may be discovered only (1) as provided in Federal Rule of Civil Procedure 35(b); or (2) upon a showing of exceptional circumstances under which it is impracticable for the parties seeking discovery to obtain facts or opinions on the same subject by other means.[9] 2 SHEPARD'S, DISCOVERY PROCEEDINGS IN FEDERAL COURT, § 16.23 (2d ed. 1991). "Rule 26(b)(4)(B) is designed to prohibit a party from using the experts of its adversary in an effort to prepare for litigation." *Id.* However, the Rule is not an "impenetrable fortress" against discovery and parties seeking discovery can make a showing of exceptional circumstances when there is no practicable alternative by which they can obtain the information. *Id. See also, Roesberg v. Johns–Manville Corp.,* 85 F.R.D. 292 (E.D.Pa.1980).

▆ Those parties seeking discovery of facts known or opinions held by consulting

---

gues that the amendment has made Rule 26(b)(4)(B) "more restrictive" because discovery of a consulting experts "facts known or opinions held" may now be done only via interrogatories or by deposition and not by Rule 34. *See* Pure Air's Final Reply Brief, p. 3 n. 3. The allegedly new restrictiveness of the amended rule does not count for much here, however, because as earlier noted, the Plaintiffs are seeking much of the Packer information by way of interrogatories.

**8.** The Plaintiffs argue that Pure Air has no right to rely on Federal Rule of Civil Procedure 26(b)(4)(B) because the NIPSCO/Pure Air Agreement demonstrates that Packer was not retained "in anticipation of litigation" and because they should not be allowed to shield "highly relevant evidence" by merely alleging that Packer "is not expected to be called as a witness at trial."

However, a fair reading of the NIPSCO/Pure Air Agreement, leads to the opposite conclusion. In fact, paragraph five of the Agreement demonstrates that the parties clearly anticipated litigation and specifically allowed for Packer's opinions to be used in such litigation only with the other parties' consent. Moreover, the context in

which the Agreement was drafted and the factual circumstances of the events leading to the hiring of Packer clearly demonstrate that litigation was inevitable, probably imminent—particularly given the immediate involvement of counsel, experts, and the enormous damages involved. Obviously, someone was going to be blamed and Pure Air had a reasonable expectation that they would be a target.

While Plaintiffs and the other Defendants obviously are unhappy with the fact that Pure Air has not designated Packer as a testifying expert, there is nothing in the record that suggests that they currently have an obligation to do so. Indeed, the designation of trial experts often cannot be identified until the latter stages of litigation. *In re Shell Oil Refinery,* 132 F.R.D. 437, 440 (E.D.La.1990), citing *United States v. 215.7 Acres of Land,* 719 F.Supp. 273, 278 (D.Del. 1989). Until such time as Pure Air affirmatively has to identify a testifying expert, they are entitled to assert that Packer will not be a witness. In so doing, they operate within the spirit of Federal Rule of Civil Procedure 26(b)(4)(B).

**9.** Fed.R.Civ.P. 35(b), which concerns an examining physician, does not apply here.

experts who are not expected to be called as trial witnesses have the burden of demonstrating the existence of exceptional circumstances. *Id.* This burden has been characterized as a "heavy" one. *In re Shell Oil Refinery,* 132 F.R.D. 437, 442 (E.D.La.1990), clarified by 134 F.R.D. 148 (E.D.La.1990). Exceptional circumstances may be shown if the parties seeking discovery are unable to obtain equivalent information essential to case preparation from other sources. *Id.* (citing *Eliasen v. Hamilton,* 111 F.R.D. 396 (N.D.Ill.1986)); *Delcastor, Inc. v. Vail Assoc., Inc.,* 108 F.R.D. 405 (D.Colo.1985); *see also, In re Shell Oil Refinery,* 132 F.R.D. at 442. "A number of cases hold that 'exceptional circumstances' allowing for discovery of a non-testifying expert's opinion exist where the object or condition observed is not observable by an expert of the party seeking discovery." *Delcastor,* 108 F.R.D. at 409; *See also, Dixon v. Cappellini,* 88 F.R.D. 1 (M.D.Pa.1980); *Roesberg,* 85 F.R.D. at 299; *Pearl Brewing Co.,* 415 F.Supp. 1122 (S.D.Tex.1976); *Sanford Const. Co. v. Kaiser Aluminum & Chemical Sales, Inc.,* 45 F.R.D. 465, 466 (E.D.Ky.1968) (decided prior to 1970 amendment to Rule 26). Likewise, "exceptional circumstances" can be shown where a non-testifying expert's report will be used by a testifying expert as the basis for an expert opinion. *Id.* (citing, *Heitmann v. Concrete Pipe Machinery,* 98 F.R.D. 740 (E.D.Missouri 1983)).

In sum, Rule 26(b)(4)(B) "is based on a concept of fairness." 4 JAMES WM. MOORE, JO DESHA LUCAS & GEORGE J. GROTHER, JR., MOORE'S FEDERAL PRACTICE ¶ 26.66[4] (2d ed. 1993). As such, issues arising under Rule 26(b)(4)(B) are resolvable only on a case-by-case basis. *Pearl Brewing Co.,* 415 F.Supp. at 1137.

■ To the extent that the issue of the subpoena becomes applicable, Rule 45 of the Federal Rules of Civil Procedure cannot be utilized for obtaining an expert's files where Rule 26(b)(4) remains the limitation on discoverability. *Marsh v. Jackson,* 141 F.R.D. 431 (W.D.Va.1992).

## IV. DISCUSSION

### A. Federal Rule of Civil Procedure 26(b)(4)(B) applies, and "exceptional circumstances" have not been shown.

■ As discussed at footnote 8, *supra,* the Plaintiffs and the other Defendants have not been successful in stripping the protections of Federal Rule of Civil Procedure 26(b)(4)(B) from Pure Air. Therefore, the critical question becomes: have the Plaintiffs and the other Defendants been able to carry their heavy burden of showing on this record demonstrable "exceptional circumstances" so as to allow discovery of the Packer report? "Exceptional circumstances" exist when "it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means." FED.R.CIV.P. 26(b)(4)(B). "The Rule has been construed to require as an exceptional circumstance, a basic lack of ability to discover the equivalent information on the part of the party moving for discovery." *Eliasen,* 111 F.R.D. at 401, (quoting *Delcastor,* 108 F.R.D. at 409).

Here, the "same subject" appears to be rather evident: the cause of the sub-surface cave in and attendant property damage. So, did the Plaintiffs and other Defendants have the ability to obtain from other sources the same information on this topic that Pure Air now possesses via Packer? *In re Shell Oil Refinery,* 132 F.R.D. at 442.

One thing appears from the current record; from July 3, 1991, and for many months thereafter, the site at the cave swarmed with lawyers, adjusters, engineers, work crews, and others. Virtually all of the present parties to this lawsuit had someone on site who was investigating causation, or they could have had them there. Certainly, the Plaintiffs, Thatcher, and even the other Defendants had ample opportunity to conduct whatever investigations they desired. Indeed, it appears that each has at least conducted some investigation. Clearly, the site was visually inspected throughout the pipe excavation process by representatives of the Plaintiffs and the other Defendants; thus Packer is not the sole source of facts and opinions concerning the collapsed pipes.

Indeed, as Pure Air demonstrated in its reply brief, other parties actually obtained detailed photographs of the pipes (Exhibits 28–31, and 34–52 to Pure Air's Reply Brief); the Plaintiffs made their own reference markings on the removed pipes (Exhibit 22, 25 to Pure Air's Reply Brief); and the Plaintiffs already have Packer's pipe marking system and the map of the pieces of pipe arranged after removal (Exhibit 22 to Pure Air's Reply Brief). Soil borings and analysis were also conducted and both Plaintiffs and Thatcher have produced copies of those records. (*See* Exhibit 27 to Pure Air's Reply Brief). Finally, both Plaintiffs and Thatcher obtained close inspection photographs of the pipes (before and after excavation) and made records regarding inspections of each piece of pipe. (*See* Exhibit 22, 28–31; 34–52 of Pure Air's Reply Brief). Finally, the Plaintiffs own consulting expert was on-site to assemble data for a pipe-failure evaluation. *See* Exhibit 20 to Pure Air's Reply Brief.

As Pure Air notes, not one party to this litigation has specifically identified and established a critical need for any of the information which might be contained in the Packer report, and which is not now available from another source. Rather, what is essentially being argued is that the entire Packer report ought to be produced because of some ill-defined "need" on behalf of the parties.

The case of *In re Shell Oil Refinery*, 132 F.R.D. 437 (E.D.La.1990) is instructive. There, on May 5, 1988, a catalytic cracking unit (CCU) at a Shell Oil refinery exploded.[10] The next day, the class action plaintiffs entered into an agreement with the defendants so that plaintiff's experts had access to the CCU to inspect, measure and photograph. Later, Shell's experts conducted metallurgical and chemical tests on the material removed from the explosion site with plaintiff's experts observing some of the tests. The Plaintiffs then sought the results of the tests conducted by Shell's in-house experts as well as leave of court to depose the authors of

Shell's preliminary expert report. Shell objected and indicated that it had not yet decided which test results and experts it intended to use at trial.

The court denied the request, noting that the Plaintiffs could obtain the substantial equivalent of the test results by having their own experts conduct the same tests. *Id.* at 443. Indeed, the Plaintiffs already had had access to the CCU for fifteen days, from May 7 through June 3, 1988, as well as to the materials tested by Shell. Thus, the only disadvantage to the Plaintiffs was that they would have to bear the costs of their own testing. The Plaintiffs desire to avoid the expense of conducting their own tests was insufficient, standing alone, to support a showing of "exceptional circumstances." *Id.* at 443.[11]

On the other hand, this case is unlike *Delcastor*, 108 F.R.D. 405 (D.Colo.1985). In *Delcastor*, after a mud slide the defendant's expert was at the site the next day and subsequently prepared a report. In ordering the report to be disclosed, the court found exceptional circumstances arising from the fact that the defendant's expert had been able to inspect the site on the day after the event; in contrast to another expert who was only able to see the site five days later, and after conditions had considerably changed due to snow melt and human activities. *Id.* at 408–9. The upshot was that the second expert's general conclusions could not be refined due to a lack of information regarding the actual site conditions at the time of the slides. Since the site conditions could not now be reconstructed the first expert's report became essential.

Unlike *Delcastor*, an immediate view of the actual cave-in at the NIPSCO facility was not essential or even very instructive. Rather, what was important occurred later: when there was a virtual autopsy of the pipes as they were excavated—all done at a rather leaden pace involving many months. The soil borings and analysis, while perhaps more

---

10. · Amazingly, a class action lawsuit was filed that same day.

11. The parties have apparently not designated testifying experts, nor are they under any obligation to do so at this point. If Pure Air's

testifying expert later reads and relies on the Packer report, it may then have to be produced. *See Heitmann*, 98 F.R.D. at 742; *Eliasen*, 111 F.R.D. at 401.

rapid, still consumed time and other boring test results are otherwise available. In short, throughout, there were (or could have been) many observers and witnesses.[12]

This case is also unlike *Sanford Construction Co.*, 45 F.R.D. 465 (E.D.Ky.1968) involving a ruptured aluminum sewer pipe. There, while the pipe was being excavated the plaintiffs refused to allow the on-site presence of the defendant's experts despite having experts of their own present. More even-handedness was present here; indeed, experts abounded and were either present at the site, or had access to it.

So, the "heavy burden" of showing "exceptional circumstances" under Rule 26(b)(4)(B) has not been met in this case. *In re Shell*, 132 F.R.D. at 442. To a certain extent this is because the Plaintiffs and the other parties offer only a generalized view of what they need from the Packer report. However, as observed in 8 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE, § 2032 (1970):

> It has been said that "since a litigant will not know what facts the opposing parties experts have discovered and what opinions they have formed, it will rarely be possible to make the required showing." (footnote omitted).
>
> It is quite clear that this is true—and equally clear that it was deliberately intended by the draftsmen of the 1970 amendment. Their formulation contemplates that in most cases discovery will not be permitted of information held by specially retained experts who are not to be called at trial. (footnote omitted). But it is not necessary, as the quotation would suggest, that the party seeking discovery know what the facts the other party's experts have discovered and what opinions they have formed. His burden is to show circumstances such that he cannot get any facts or opinions on the subject in which he

is interested. Ordinarily that will not be the case but in the unusual situation to which Rule 26(b)(4)(B) is directed the Rule will permit discovery.

*Id.*

Both Edward Grey and Chicago Underwater suggest that they fall within this "unusual situation" because they never had reason to believe that they would be made parties to this lawsuit while actual remediation was occurring; thus, they say they had no experts present and had no reason to pay any particular attention to causational facts.

While this all might be true, there has been no showing that Chicago Underwater and Edward Grey cannot obtain all they need to know from other sources. Moreover, neither one has suggested that only limited facts and/or opinions in the Packer report should be produced to them. If they could identify specific facts otherwise not known or available to them, then the court might entertain such a limited request.[13] However, a blanket request for the entire Packer report will not carry the day on this record. At bottom, what Edward Gray and Chicago Underwater are really suggesting is that they ought to have the Packer report so they can avoid the expense of doing their own factual review and expert analysis. This is contrary to the intent of the Rule which is to prevent "one party from having a free ride at the expense of the other party." *In re Shell Oil Refinery*, 132 F.R.D. at 443. Therefore, on this record, no exceptional circumstances exist to justify discovery of the Packer report by any of the parties.

B. *Pure Air has not waived the protections afforded under Federal Rule of Civil Procedure 26(b)(4)(B).*

■ A contention only briefly raised and lightly argued concerns whether Pure Air has waived the protections of Federal Rule of Civil Procedure 26(b)(4)(B) through the is-

---

**12.** It has been contended that Packer was an "actor-viewer," however others were clearly so; there is no showing that the Plaintiffs and other co-Defendants cannot adequately prepare their case without the Packer information. *See U.S. v. Hooker Chemicals and Plastics Corp.*, 112 F.R.D. 333, 337–38 (W.D.N.Y.1986).

**13.** Of course, disclosure of certain facts and opinions from the Packer report to only Chicago Underwater or Edward Grey prompts a concern that the other Defendants or Plaintiffs might be prejudiced. The court does not need to address that concern now.

suance of a one-page NIPSCO press release, concerning Packer's conclusions, provided to *Electric Utility Week,* a trade publication. The same information may also have been submitted to Pure Air's co-Defendants prior to the lawsuit having been filed.

The Plaintiffs argue that as a result of the limited information published in *Electric Utility Week* (*see* Exhibit B to Plaintiffs' Response to Pure Air's Motion) a complete waiver of any confidentiality or work product privilege attaching to the entire Packer report, has occurred.

Pure Air argues that the court must examine the purpose of the protection provided by the Rules to ascertain whether waiver has truly occurred. As Pure Air sees it, the purpose of Federal Rule of Civil Procedure 26(b)(4)(B) is to protect trial strategy and prevent one party from taking a free ride at the expense of the other party. *See* Pure Air's Reply Brief, p. 14 citing *In re Shell Oil Refinery,* 132 F.R.D. 437 (E.D.La.1990). Given that rationale, Pure Air argues that no waiver has occurred because their permission to allow NIPSCO to disclose the one-page summary was not inconsistent with that purpose. Moreover, Pure Air argues that any disclosure to its co-Defendants was done in the interest of combatting a common adversary (i.e. the Plaintiffs). Therefore, Pure Air suggests that waiver has only occurred, at most, to the one-page summary.

Arguably, the protections afforded under Federal Rule of Civil Procedure 26(b)(4)(B) are waivable. *See United States v. Hooker Chemicals & Plastics Corp.,* 112 F.R.D. 333, 336–7 (W.D.N.Y.1986). However, generally, "waiver of a privilege occurs when actions by the holder would make it unfair to insist that the privilege still exists." *In re Dayco Corp. v. Derivative Securities Litigation,* 99 F.R.D. 616 (S.D.Ohio 1983). Thus, in the context of work product immunity, and observed in 8 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2024 (1970):

> [T]he result should be that disclosure of a document to a third person does not waive the work product immunity unless it has substantially increased the opportunities for potential adversaries to obtain the information. Most cases have so held and have found no waiver from disclosure. (footnotes omitted).

On the question of what conduct amounts to waiver, a number of courts have accepted the formulation set forth in proposed (but never adopted) Federal Rule of Evidence 511 which declares that waiver occurs when the holder "voluntarily discloses ... any significant part of the privileged matter." *Id.* at 616. *See also,* 2 JACK B. WEINSTEIN, MARGARET A. BERGER, WEINSTEIN'S EVIDENCE ¶ 511[02] (1993).

Here, while NIPSCO released information which ultimately found its way into *Electric Utility Week,* it did not begin to recite all of Packer's studies, factual findings or conclusions. Thus, what was released did not constitute "a significant part of the privileged matter" so as to work a waiver in this case. *See In re Dayco Corp.,* 99 F.R.D. at 616, 619 (S.D.Ohio 1983) (release of two-page findings did not warrant discovery of entire report— particularly where the report itself was not released); *In re Von Bulow,* 828 F.2d 94, 102–103 (2d Cir.1987) (extra judicial disclosure of privileged communications in a book did not waive privilege beyond "matters actually revealed"); *United States v. O'Malley,* 786 F.2d 786, 793–4 (7th Cir.1986) (witness does not waive attorney-client privilege by disclosing a subject which he had discussed with his attorney).

Indeed, given the rather massive nature of the Packer report, and the rather minuscule disclosure in the one-page summary, it is still fair for Pure Air to insist that the protection remains intact. *In re Dayco Corp.,* 99 F.R.D. at 619. In the same vein, NIPSCO's modest disclosure has not substantially increased the opportunities for opposing counsel to obtain the causational information they desire. 8 CHARLES A. WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE AND PROCEDURE, § 2024 (1970).

While waiver has occurred as to the one-page summary (particularly since it has been given to the co-Defendants) it does not extend to the actual report or to all of the underlying Packer documents. *Duplan Corp. v. Deering Milliken, Inc.,* 540 F.2d

**212**

1215, 1222–23 (4th Cir.1976) (no waiver of the entire subject matter where only partial disclosure has occurred).

This case is unlike the waiver situation of *Suburban Sew'n Sweep, Inc. v. Swiss–Bernina*, 91 F.R.D. 254 (N.D.Ill.1981), cited by Plaintiffs, because that case involved a litigant who was careless in protecting documents that were otherwise privileged. There, the court found that because a party had thrown privileged materials into a trash bin which were ultimately found by an opposing party, inadequate measures for protection against inadvertent disclosure resulted in waiver. *Data General Corp. v. Grumman System's Support Corp.*, 139 F.R.D. 556 (D.Mass.1991) (same). There is no showing here that Pure Air has failed to take those precautions necessary for the protection of confidential materials. In fact, none of the cases cited by Plaintiffs suggest that after some limited voluntary disclosure has occurred (for instance, in a press release) that all of the underlying documents relied upon must then be produced. *See Republic of Philippines v. Westinghouse Electric Corp.*, 132 F.R.D. 384 (D.N.J.1990). *See also, In re Grand Jury Subpoena Duces Tecum*, 566 F.Supp. 883, 884 ("No authority has been cited for the proposition that a document loses its privileged nature simply because the owner of the privilege relies on the material contained in the document in making a statement in *another* document.")

As a consequence then, the court finds that waiver has not occurred merely as a result of the issuance of the one-page press release by NIPSCO. Waiver has only occurred to the press release itself.

### V. *CONCLUSION*

While the facts of this dispute present a close question, Pure Air has shown "good cause" for the issuance of a protective order and for the quashing of the subpoena directed to Packer. *See* Federal Rule of Civil Procedure 26(c)(4). Accordingly, upon reconsideration the facts known and opinions held by Packer and the Packer documents and materials are hereby protected from discovery. The subpoena served on Packer is hereby quashed. The court confirms that this matter is set for a discovery status conference for January 21, 1994, at which time the court will consider deadlines for disclosing testifying experts and the dates for expert depositions.

Enter this 13th day of December, 1993.