**BANK BRUSSELS LAMBERT,**
et al., Plaintiffs,

v.

The **CHASE MANHATTAN BANK,**
**N.A.,** et al., Defendants and
Third–Party Plaintiffs.

The **CHASE MANHATTAN BANK,**
**N.A.,** et al., Plaintiffs,

v.

**ERNST & YOUNG,** a Partnership,
et al., Defendants.

**BANK BRUSSELS LAMBERT,**
et al., Plaintiffs,

v.

**BANQUE PARIBAS (SUISSE)**
**S.A.,** et al., Defendants.

**BANK BRUSSELS LAMBERT,**
et al., Plaintiffs,

v.

**CREDIT LYONNAIS (SUISSE)**
**S.A.,** et al., Defendants.

Nos. 93 Civ. 5298 (LMM)(RLE), 93 Civ. 8270 (LMM)(RLE), 94 Civ. 1317 (LMM)(RLE) and 93 Civ. 6876 (LMM)(RLE).

United States District Court,
S.D. New York.

June 30, 1997.

Lance Gotthoffer, Oppenheimer Wolff & Donnelly, New York City, for Bank Brussels Lambert in Nos. 93 Civ. 5298, 93 Civ. 8270.

William F. Duker, Ducker & Barrett, New York City, Lance Gotthoffer, Oppenheimer

Wolff & Donnelly, New York City, Christopher Allegaert, Allegaert Berger & Vogel, LLP, New York City, David Boies, David Boies and Assoc., Armonk, NY, for Banque Indosuez, in No. 93 Civ. 5298.

Christopher Allegaert, Allegaert Berger & Vogel, LLP, New York City, David Boies, David Boies and Assoc., Armonk, NY, for Swiss Bank Corp. in No. 93 Civ. 5298.

Jmaes A. Beha, Hertzog, Calamari & Gleason, New York City, James Gunther, Gunther & Assoc., Washington, DC, for Chase Manhattan Bank, N.A., in No. 93 Civ. 5298.

Lance Gotthoffer, Oppenheimer Wolff & Donnelly, New York City, for Skopbank in No. 93 Civ. 8270.

Ronald S. Rauchberg, Proskauser Rose Goetz & Mendelsohn, New York City, for Ernst & Young, John J. Reck, Robert J. Kelly, Richard A. Young, William J. Lipton, in No. 93 Civ. 8270.

Robert L. Weigel, Gibson Dunn & Crutcher, New York City, for Bank Brussels Lambert, Skopbank, in No. 94 Civ. 1317.

Robert L. Weigel, Gibson Dunn & Crutcher, New York City, David Boies, David Boies and Assoc., Armonk, NY, for Swiss Bank Corp., Bank Indosuez, in No. 94 Civ. 1317.

Jed S. Rakoff, Fried, Frank, Harrism Shriver & Jacobson, New York City, John F. Zulack, Flemming, Zulack & Williamson, LLP, New York City, for Banque Paribas (Suisse) S.A. in No. 94 Civ. 1317.

Robert L. Weigel, Gibson Dunn & Crutcher, New York City, for Bank Brussels Lambert, in No. 93 Civ. 6876.

Donald F. Luke, Rogers & Wells, New York City, for Credit Lyonnais (Suisse), S.A., in No. 93 Civ. 6876.

John A. Borek, Fried Frank Harris Shriver & Jacobson, New York City, for Banque Paribas (Suisse), S.A., in No. 93 Civ. 6876.

Robert L. Weigel, Gibson Dunn & Crutcher, New York City, William F. Duker, Ducker & Barrett, New York City, Christopher Allegaert, Allegaert Berger & Vogel LLP, New York City, David Boies, David Boies and Assoc., Armonk, NY, for Swiss Bank Corp., Skopbank, in No. 93 Civ. 6876.

*MEMORANDUM AND ORDER*

McKENNA, District Judge.

The Chase Manhattan Bank, Bank Indosuez, Swiss Bank Corporation and Arthur Anderson & Co. ("Anderson") object to the Memorandum Opinion and Order dated June 25, 1997 of Magistrate Judge Ellis (the "Order") which granted the motion of Bank Paribas (Suisse) S.A. ("Bank Paribas") to compel the deposition of Anderson, and denied Anderson's cross-motion for a protective order preventing the deposition of Anderson witnesses (or, in the alternative, limiting the number of deposition days for such witnesses and the subject matter to be covered, and granting fees and expenses for such witnesses).

The objections to the Order are overruled and the Order is affirmed. The objecting parties have not shown that the Order is clearly erroneous or contrary to law. 28 U.S.C. § 636(b)(1)(A). The specific facts cited by Judge Ellis, even putting aside his familiarity with the above cases, fully support his legal analysis concluding that, here, there are exceptional circumstances within the meaning of Fed. R. Civ. P. 26(b)(4)(B) which permit the deposition of Anderson. Nor, the role of Anderson being as *sui generis* as it is in relation to the facts underlying this litigation, does the Order seem at all likely to "diminish the willingness of experts to serve as consultants." *Rubel v. Eli Lilly and Co.*, 160 F.R.D. 458, 460 (S.D.N.Y.1995).

As the Court understands the Order, it recognizes Anderson's right to reasonable fees and costs for its witnesses (Order at 19), and that the depositions are to be limited to the 96 subjects identified by Bank Paribas. (*Id.* at 11.)

According to the Court's practice in the above cases, a copy of this Memorandum and Order is being sent only to counsel for Bank Paribas, who are to deliver or fax copies to counsel for all parties and counsel for Anderson.

So Ordered.

## MEMORANDUM OPINION AND ORDER

ELLIS, United States Magistrate Judge.

### I. INTRODUCTION

This matter is before the court upon the motion of defendant Bank Paribas (Suisse) S.A. ("BPS") to compel depositions of the public accounting firm, Arthur Andersen & Company ("Andersen"), with respect to cases 93 Civ. 6876 and 94 Civ. 1317 ("the CLS/BPS Cases"). Non-party Andersen opposes the motions and cross-moves for a protective order. The Chase Manhattan Bank, N.A. ("Chase") joins in Andersen's opposition and cross-motion.[1] For the following reasons, BPS's motion is **GRANTED** and Andersen's cross-motion is **DENIED.**

### II. BACKGROUND

In 1990, a group of secured lenders ("the Bank Group"), consisting of Chase Manhattan Bank, N.A., Swiss Bank Corp., Banque Indosuez, Skopbank and Bank Brussels Lambert, entered into a revolving credit agreement ("RCA") to fund AroChem International, Inc. and AroChem Corporation (collectively "AroChem"), two entities controlled by Roy William Harris, a.k.a. William R. Harris. Chase was named as the Agent for the Bank Group. The RCA provided a $235 million credit facility designed to provide funding for AroChem's purchase of crude oil and to permit it to establish "hedge" positions to protect against price fluctuation. The RCA limited AroChem's net open position to one million barrels and prohibited it from speculating or trading in oil for pur-

---

1. For purposes of this motion, Andersen is represented by Solomon, Zauderer, Ellenhorn, Frischer & Sharp, and by co-counsel, Milbank, Tweed, Hadley & McCloy ("Milbank"). Milbank represents Chase and the other bank lenders to AroChem under the revolving credit agreement (Chase Manhattan Bank, Swiss Bank Corp., Banque Indosuez, Skopbank, and Bank Brussels Lambert ("the Bank Group")). Under the terms of Andersen's engagement by Milbank, Andersen agreed to tender to Milbank the defense of any subpoena seeking discovery of Andersen. Memorandum at Arthur Andersen & Co. in Opposition to Motion to Compel Deposition and in Support of Cross–Motion for a Protective Order ("Andersen Mem.") at 1 nn. 1–2; Affidavit of Richard C. Tufaro dated August 2, 1996 ("Tufaro Aff. I") at ¶ 18.

poses other than hedging. As security for the RCA, AroChem pledged its assets, including its accounts receivable.

Sometime thereafter, Harris established a new entity, AroChem International, Ltd. ("Ltd."), as a vehicle to obtain further financing. Credit Lyonnais (Suisse) ("CLS") and Bank Paribas (Suisse) ("BPS") lent approximately $120 million and $100, respectively, to Ltd., and, assertedly in partial repayment of the loans, Harris transferred approximately $5 million to CLS and $1.8 million to BPS. *Id.*

### A. When Andersen Was First Retained

In November or December 1991, the Bank Group discovered a significant discrepancy between the actual value of AroChem's inventories and the reported value of the inventories as represented in the borrowing base reports submitted to the Bank Group. Mins. I[2] at 1. Chase asked AroChem to explain the discrepancy and advised AroChem that "further draw downs under the working capital line were dependent upon the banks being satisfied with [AroChem]'s explanation [of the discrepancy]." Mins. I at 1–2; *see also* White Dep.[3] at 773–74.

In response to learning about the alleged discrepancy between the reported inventory and the actual inventory, two of AroChem's board members, Gene Sebastian and Joseph Sheperd resigned and consulted attorneys in order to protect themselves from liability, Skopbank Report[4] at 2, and AroChem's board of directors called a special meeting, which was held on December 23 and 24, 1991. Mins. I at 1. At that meeting, the board of directors removed AroChem officers Harris and V.J. Dispenza for possible fraud. Mins. I at 5; Skopbank Report at 1. Furthermore, it resolved to form a special committee ("Special Committee") "for the purposes of investigating and reporting on all matters bearing upon: (1) the discrepancy in [AroChem]'s reporting of inventories; (2) the financial operations reporting generally; and (3) the performance of [AroChem]'s officers and employees." Mins. I at 5; *see also* Johnson Aff.[5] at ¶¶ 2–3; Weyman Aff.[6] at ¶ 2; Lynch Aff.[7] at ¶ 2. To achieve these purposes, the board specifically empowered the Special Committee "to engage legal counsel and independent accountants and such other experts as it deems necessary." Mins. I at 5. At that meeting, it was also reported that tax authorities in Puerto Rico had instituted "a new substantial tax claim" against AroChem. Mins. I at 2.

At the end of the December 23 or 24, 1991 meeting, AroChem engaged Andersen to investigate its inventory and to determine whether the inventory was properly stated in AroChem's financial statements. Lynch Test.[8] at 2388–89, 2566; *see also* Johnson Aff. at ¶¶ 2–3; Weyman Aff. at ¶ 2; Lynch Aff. at ¶ 2. On December 24, 1991, Andersen began its investigation of AroChem, using eight to fifteen Andersen employees. Lynch Test. at 2391, 2396, 2594.

Between December 24 and 27, 1991, Chase had several conversations with other members of the Bank Group. As a result of these conversations, at least one member of the Bank Group came to believe that there had been a massive fraud at AroChem, that Will

---

2. "Mins. I" refers to the minutes of a Special Meeting of AroChem's Board of Directors on December 23 and 24, 1991, located at Exhibit 6 of the Exhibits Submitted in Support of Banque Paribas (Suisse) S.A.'s Renewed Motion to Compel Production of Arthur Andersen & Co. Materials. (These Exhibits were resubmitted in the instant motion and shall be referred to as ";BPS's Exhibits.")

3. "White Dep." refers to the deposition of J. Stuart White, III, located at Exhibit 13 of BPS's Exhibits.

4. "Skopbank Report" refers to Skopbank's Report of Call located at Exhibit 12 of BPS's Exhibits.

5. "Johnson Aff." refers to the affidavit of Eric C. Johnson, located at Exhibit C of Tufaro Aff. I.

6. "Weyman Aff." refers to the affidavit of Mark L. Weyman, located at Exhibit D of Tufaro Aff. I.

7. "Lynch Aff." refers to the affidavit of Robert S. Lynch, located at Exhibit E of Tufaro Aff. I.

8. "Lynch Test." refers to the transcript of Robert S. Lynch's testimony at the criminal trial of William Harris, located at Exhibit 5 of BPS's Exhibits.

Harris had improperly diverted AroChem funds into his own personal accounts and/or other accounts, that AroChem had been covering up its substantial trading losses, and that phony contracts had been drawn up and given to AroChem's accountant, Ernst & Young, to cover the losses. Skopbank Report at 1, 5.

Shortly after Andersen began its investigation of AroChem, the Special Committee retained Anderson Kill as legal counsel in order to assist the Special Committee in determining the cause of certain irregularities in AroChem's financial condition and "in evaluating what claims, if any, should be made and against whom." Weyman Aff. at ¶¶ 2–3. Although the Special Committee hired Andersen before it hired outside counsel, "the Special Committee at all times intended that [Andersen] report to and serve under the direction of outside counsel. When Anderson Kill was retained, the Special Committee requested [that] Anderson Kill formalize the engagement and direct the activities of [Andersen]." Johnson Aff. at ¶¶ 2–3; *see also* Retention Agr.[9] at 1; Weyman Aff. at ¶ 2; Lynch Aff. at ¶ 2.

## B. AroChem and the Bank Group's Joint Retention of Andersen

Also in December 1991, the Bank Group retained Milbank as counsel "to assist in the recovery of amounts loaned to AroChem, to investigate evidence of fraud and to render legal advice and assistance in evaluating and pursuing claims to recover the Bank Group's losses." Tufaro Aff. II[10] at ¶ 2.

On February 14, 1992, the Bank Group, represented by Milbank, filed involuntary petitions for relief against AroChem under Chapter 11 of the Bankruptcy Code. Weyman Aff. at ¶ 5. Anderson Kill served as counsel to the AroChem debtors-in-possession in the bankruptcy cases, Weyman Aff. at ¶ 7, and one of Andersen's partners, Robert

Lynch, apparently testified on behalf of the Bank Group in the bankruptcy proceedings. BPS Mem.[11] at 9.

On February 27, 1992, Gregory Classon, General Counsel and Secretary for AroChem, was interviewed by the FBI and the United States Attorney's office as part of the Government's investigation into AroChem's financial affairs. Classon Ltr. I.[12] Between February and April 1992, AroChem and the Bank Group negotiated an agreement under which Milbank and Anderson Kill would jointly retain Andersen "to further pursue its investigative accounting work." Weyman Aff. at ¶ 7; Tufaro Aff. II at ¶ 3. The agreement was signed on or about April 10, 1992. Retention Agr. at 1; Weyman Aff. at ¶ 7. The agreement contemplated that, in addition to the investigative accounting work, Andersen would perform accounting services for the AroChem estates related to the bankruptcy issues. Weyman Aff. at 6–9; *see also* Lynch Aff. at ¶ 3; Tufaro Aff. II at ¶¶ 3–4. The bankruptcy portion of work was under the sole direction of the AroChem estates, whereas the investigative work was intended to be performed under the joint direction of Milbank and Anderson Kill. Weyman Aff. at 6–9.

Andersen's investigation of AroChem continued through June 26, 1992, and consumed approximately 10,000 hours. Lynch Test. at 2396–97. The major bulk of Andersen's investigative work occurred between December 1991 and June 1992, and most substantially between December 1991 and January 1992. Lynch Test. at 2569–70; Lynch Aff. at ¶ 2. Based upon that investigatory work, which included examining AroChem's inventory, books, and records, Andersen determined that AroChem had recorded fictitious cargoes and contracts. Lynch Test. at 2390, 2392–93. After June, Andersen's work tapered off considerably. Lynch Test. at 2569–70.

---

9. "Retention Agr." refers to the Agreement Authorizing Joint Retention, located at Exhibit 14 of BPS's Exhibits.

10. "Tufaro Aff. II" refers to the December 4, 1994 affidavit of Richard C. Tufaro, located at Exhibit B of Tufaro Aff. I.

11. "BPS Mem." refers to BPS's Memorandum of Law in Support of its Motion to Compel Depositions of Arthur Andersen & Co. Witnesses.

12. "Classon Ltr. I" refers to the February 27, 1992 letter of Gregory B. Classon, located at Exhibit 8 of BPS's Exhibits.

In August 1992, as a result of Andersen's investigative findings, the Bank Group filed an action for fraud, negligent misrepresentation and negligence against Ernst & Young, AroChem's independent public accountant who prepared AroChem's audits in 1989, 1990 and 1991. Tufaro Aff. II at ¶ 2; *Bank Brussels Lambert v. Chase Manhattan Bank. N.A.*, 1994 WL 419934, at *1 (S.D.N.Y. Aug.10, 1994).

## C. The Bank Group's Sole Retention of Andersen

On August 24, 1992, the AroChem cases were converted to Chapter 7, and subsequently Milbank alone retained Andersen on behalf of the Bank Group. Tufaro Aff. II at ¶ 7; Weyman Aff. at ¶ 7; Tufaro Aff. I at ¶ 16. Andersen has continued to be retained by Milbank through the present time, conducting investigative accounting work. Tufaro Aff. II at ¶ 7.

## D. Retention of Andersen by the U.S. Attorney's Office

In September 1992, the United States Attorney's Office hired Andersen in connection with its prosecution of William R. Harris, the former President of AroChem. On December 2 and 3, 1992, Robert S. Lynch, a partner of Andersen, testified as an expert witness for the Government at Harris' criminal trial. Lynch Aff. at ¶¶ 1, 6; Lynch Test. at 2380; Schmidt Aff. I,[13] Ex. L. Also, Andersen prepared more than twenty exhibits for the Government's use at trial summarizing Andersen's work. Ex. 22 of BPS's Exhibits.

## E. Storage of AroChem's documents

In investigating AroChem's financial affairs, Andersen apparently had "a broad base charge to just look everywhere and find anything and turn it over twice." Classon Dep. at 447. Numerous other parties also visited AroChem's offices and investigated its books and records during the same time that An-

dersen was conducting its investigation, including Milbank; Ernst & Young; the "Morvillo firm," which represented Harris; Edwin Wells, who was engaged in litigation against AroChem; the Internal Revenue Service; and Price Waterhouse, who was conducting a review for the Chase syndicate banks. Each of these parties were given unlimited access to all of AroChem's books and records, as well as its personal legal files. *Id.* at 448–50, 466, 470, 504–13, 517–18. No one was assigned to watch over the removal and copying of documents. *Id.* at 474–75. Classon testified that he did not know and could not recall if Andersen or Milbank ever removed original documents without leaving copies behind, *id.* at 466–68; Classon Ltr. II [14], although he had no reason to believe that documents were not put back in their original place. *Id.* at 473–75.

In October 1993, Jefferson Archives removed from AroChem's Stamford, Connecticut, offices all of the AroChem files. Bernblum Aff.[15] at ¶¶ 2–5, 8. The documents were removed and stored in the same condition in which they were found at AroChem's Stamford office. *Id.*; Lynch Aff. at ¶¶ 7–8; Classon Aff.[16] at ¶¶ 3–4. The files and/or file boxes were then indexed and catalogued. Those files "have either been maintained in Jefferson Archives' warehouse or released into the custody of the AroChem Trustee or to other persons at the direction of the Trustee." Bernblum Aff. at ¶ 5. A person seeking to review the documents stored at Jefferson Archives could review them at the Archives and, after reviewing them, sign an affidavit declaring that no documents had been removed or altered. *Id.* at ¶ 6. Also, at the Trustee's direction, a person could gain permission to remove and copy documents, but only if a Jefferson Archives employee accompanied the files throughout the removal and copying process. *Id.* at ¶ 7. Lynch and other Andersen professionals reviewed the AroChem files after they were stored at

---

**13.** "Schmidt Aff. I" refers to the affidavit of Alexander H. Schmidt dated June 17, 1996.

**14.** "Classon Ltr. II" refers to the January 28, 1993 letter by Gregory Classon, located at Exhibit 29 of BPS's Exhibits.

**15.** "Bernblum Aff." refers to the December 1, 1994 affidavit of Steven Bernblum, located at Exhibit G of Tufaro Aff. I.

**16.** "Classon Aff." refers to the affidavit of Gregory Classon, located at Exhibit H of Tufaro Aff. I.

Jefferson Archives and reported that the files "remained in essentially the same condition as they were when kept in the ordinary course of business at AroChem's offices." Lynch Aff. at ¶ 8.

### F. CLS/BPS Cases

On October 1, 1993, the Bank Group filed suit against CLS, 93 Civ. 6876, alleging that CLS's financial interactions with Ltd. effectuated a conversion of AroChem's accounts receivable, in which the Bank Group held a security interest under the RCA. On February 28, 1994, the Bank Group filed suit against BPS for similar reasons, 94 Civ. 1317. The Bank Group accuses CLS and BPS of knowingly being involved in Harris' acts of bank fraud and money laundering.

### G. Consolidation with E & Y/Chase Cases

The CLS/BPS Cases were later consolidated for discovery and pretrial proceedings with two other cases: the Bank Group's action against Ernst & Young, which had been filed in New York State Supreme Court on or about August 1992 and transferred to the United States District Court in June 1993, 93 Civ. 8270 ("the E & Y Case"), and the action against Chase by the other members of the Bank Group, 93 Civ. 5298 ("the Chase Case") (collectively, "the E & Y/Chase Cases"). Consolidation Order [17] at 2. The cases were not consolidated for trial, but the overlap of factual issues raises that possibility.

Also, all parties in the E & Y/Chase Cases and the CLS/BPS Cases have agreed to reciprocal discovery, as reflected in the Reciprocal Discovery Order entered by Magistrate Judge Francis on July 13, 1995. In general, that order required all parties in the four actions to produce or otherwise exchange among themselves all discovery materials that have become or will become available in any of the four actions. Reciprocal Discovery Order [18] at 2–3. That order has been extended through the present time.

In the E & Y Case, the court required Chase to designate Andersen as a testifying expert or be foreclosed from so designating Andersen in the future. Presented with this choice, Chase designated Andersen as a testifying expert in the E & Y case. Tufaro Aff. I at ¶ 7; Schmidt Aff. I at ¶ 6. As a result of that designation, Chase reasoned that it was obligated under Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure to produce the Andersen documents in the E & Y case. Chase further reasoned that, based upon the Reciprocal Discover Order, since it was producing the Andersen documents in the E & Y case, it was obligated to produce the same documents to the defendants in the CLS/BPS cases. Tufaro Aff. I at ¶¶ 7, 9–10. Therefore, Chase, plaintiffs and Andersen agreed to voluntarily produce Andersen documents to BPS. Schmidt Aff. I at ¶¶ 7, 14–16; Tufaro Aff. II at ¶¶ 7–9.

### H. Discovery of Andersen

On February 20, 1996, BPS issued a subpoena to depose Andersen partner, Robert Lynch. Schmidt Aff. I, Ex. G. Milbank opposed the subpoena, asserting that Andersen is a non-testifying expert and that BPS had not demonstrated exceptional circumstances, as required by Rule 26(b)(4)(B), for deposing Lynch. Milbank agreed to produce Lynch only as to "a few strictly limited topics on which Arthur Andersen could testify as a 'fact' witness." Schmidt Aff. I, Ex. K at 2. However, Milbank refused to produce Andersen for testimony "on subjects where it acted as an expert." *Id.* Milbank pressed BPS to list the subjects upon which it would seek to depose Andersen. *Id.* BPS submitted a list of 96 subjects which Lynch testified to at Harris' criminal trial. Schmidt Aff. I, Exs. L & M. Milbank responded that it would allow Lynch to be deposed only as to six of those subjects. Schmidt Aff. I, Ex. M at 4. The parties were unable to reach a mutually agreeable resolution. On June 17, 1996, BPS moved to compel depositions of Andersen, and on August 5, 1996, Andersen crossmoved for a protective order.

All the documents stored at Jefferson Archives have been made available to movant

---

17. The Consolidation Order is located at Exhibit L of Tufaro Aff. I.

18. The Reciprocal Discovery Order is located at Exhibit D of Schmidt Aff. I.

BPS, along with the documents created by Andersen as part of its investigation, the transcript of Lynch's testimony at Harris' criminal trial, and the exhibits marked at the criminal trial. Tufaro Aff. II at ¶ 6; Tufaro Aff. I at ¶¶ 7, 10. Also, AroChem's former employees are available for deposition by subpoena, and defendants in the CLS/BPS cases have deposed twenty-eight AroChem witnesses for a total of seventy deposition days and plan to depose more. Andersen Mem. at 8; Tufaro Aff. I at ¶ 3; Tufaro Aff. I, Exs. A & L.

At least one of plaintiffs' officers has conceded that it would be more difficult now to reconstruct AroChem's collateral position as of December 1991 than it was for Andersen to reconstruct that collateral position when it conducted its work. Altorfer Dep.[19] at 400–01.

## III. DISCUSSION

Andersen asserts that it is shielded from discovery by Rule 26(b)(4)(B) of the Federal Rules of Civil Procedure, which provides in relevant part,

> A party may, through interrogatories or by deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial only ... upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means.

Andersen claims that Rule 26(b)(4)(B) applies here because it was retained as an expert in anticipation of litigation and will not be called to testify at trial in the CLS/BPS Cases. Andersen contends, however, that BPS has not made the requisite showing of exceptional circumstances.

BPS presents several alternative arguments in favor of the depositions. First, BPS argues that Rule 26(b)(4)(B) does not apply because BPS seeks to depose Andersen as an ordinary fact witness, not as an expert. Second, BPS argues that Rule 26(b)(4)(B) does not apply because Andersen was hired for business purposes, not in anticipation of litigation. Third, BPS argues that, even if Andersen is an expert who was hired in anticipation of litigation, it should be treated as a testifying witness under Rule 26(b)(4)(A) because Andersen is testifying in 93 Civ. 5298 and 93 Civ. 8270 ("the E & Y/Chase Cases"), the cases consolidated for discovery with the CLS/BPS Cases. Fourth, BPS argues that, even if Andersen is a nontestifying expert who is protected from discovery by Rule 26(b)(4)(B), exceptional circumstances exist which justify discovery. Finally, BPS argues that any right to protection as a non-testifying expert was waived when Andersen documents were disclosed to various parties, including BPS.

While Ernst & Young does not formally join BPS's motion, Ernst & Young agrees with BPS that Andersen is a fact witness or, alternatively, that any expert witness protection was waived. Letter from David M. Lederkramer to the court, dated September 16, 1996. Similarly, William Harris has submitted a letter in support of BPS's motion. Letter from John B. Conway to the court, dated September 13, 1996.

### A. Does Rule 26(b)(4)(B) apply?

#### 1. Is Andersen an ordinary fact witness or an expert?

BPS first argues that Andersen is an ordinary fact witness, not an expert witness, and therefore is subject to discovery under the rules governing ordinary fact witnesses rather than under the rules governing expert witnesses. This argument is without merit. Andersen is clearly an "expert" in that it brought its technical background to bear in examining AroChem's accounts and records and in that it was specifically engaged to so examine AroChem in connection with the alleged discrepancy between the actual and reported value of AroChem's inventory. Andersen does not forfeit its status

---

19. "Altorfer Dep." refers to the deposition of Walter R. Altorfer, located at Exhibit 30 of BPS's Exhibits.

as an expert merely because it learned "facts" in the course of its investigation in addition to developing expert opinions. *See Chiquita Int'l Ltd. v. M/V Bolero Reefer*, 1994 WL 177785, at *1 (S.D.N.Y. May 6, 1994). For purposes of Rule 26(b)(4)(B), "the relevant distinction is not between fact and opinion testimony but between those witnesses whose information was obtained in the normal course of business and those who were hired to make an evaluation in connection with expected litigation." *Id.* Thus, the next inquiry is whether Andersen was hired in anticipation of litigation.

## 2. Was Andersen hired in anticipation of litigation?

In determining whether an expert was hired in anticipation of litigation, the court must examine "the total factual situation in the particular case." *Hartford Fire Ins. v. Pure Air on the Lake Ltd.*, 154 F.R.D. 202, 207 (N.D.Ind.1993). To conclude that an expert was hired in anticipation of litigation, a lawsuit need not have been filed, but there must have existed "more than a remote possibility of litigation." *United States v. Bell*, 1994 WL 665295, at *4 (N.D.Cal. Nov. 9, 1994).

The facts surrounding the Special Committee's decision to hire Andersen reflect that there existed more than a remote possibility of litigation and that Andersen was hired in anticipation of litigation. Andersen was hired by AroChem's Special Committee in the wake of the discovery by AroChem's major financier, the Bank Group, that there was a significant discrepancy between the actual value of AroChem's inventory and the value reported to the Bank Group. At least one member of the Bank Group suspected that there had been a "massive fraud" at AroChem, and in response, the Bank Group threatened to terminate further draw downs of capital if AroChem could not satisfactorily explain the discrepancy. AroChem reacted quickly and radically to recent events by empowering a special committee to investigate the discrepancy, investigate AroChem's financial operations generally, and investigate the performance of AroChem's officers. AroChem immediately hired not only Andersen, but also outside legal counsel, and removed Harris and Dispenza as officers and employees. Also, two of AroChem's board members resigned and consulted attorneys in order to protect themselves from liability.

The facts leading up to and surrounding AroChem's decision to hire Andersen demonstrate that litigation was highly likely, "particularly given the immediate involvement of counsel, [an] expert[ ], and the enormous [potential] damages involved." *Hartford Fire Ins.*, 154 F.R.D. at 207 n. 8. The significant discrepancy reflected the potential that there had been a "massive fraud" at AroChem. "Obviously, someone was going to be blamed and [AroChem] had a reasonable expectation that [they] would be a target." *Id.*

## 3. Should Andersen be treated as a testifying witness since Andersen is testifying in the E & Y case, which has been consolidated for discovery?

Plaintiffs in the CLS/BPS Cases have not designated Andersen as a testifying witness. Until they affirmatively identify Andersen as a testifying witness or the court sets a date by which plaintiffs must so identify Andersen, Andersen is entitled to the protection afforded by Rule 26(b)(4)(B). *See id.; Lilley v. Dow Chem. Co.*, 105 F.R.D. 577, 580 (E.D.N.Y.1985) (*"In re Agent Orange"*). Andersen's status as a non-testifying witness in the CLS/BPS Cases is not altered by the fact that Andersen is a testifying witness in the E & Y Case which was consolidated with the CLS/BPS Cases for purposes of discovery and pretrial proceedings. At best, the Reciprocal Discovery Order requires the E & Y/Chase parties to share with the CLS/BPS parties any discovery materials that become available in the E & Y/Chase Cases. This means only that all parties are entitled to have copies of transcripts of depositions, not that all parties are entitled to depose a given witness simply because the parties in one case demonstrate that they are entitled to depose that witness. The parties in the CLS/BPS Cases must independently demonstrate their entitlement to depose a witness.

The parties in the E & Y Case are entitled to depose Andersen as a testifying witness

because Andersen is designated as a trial witness in that case. Once Andersen was designated as a trial witness in the E & Y Case, the parties in that case gained the right to depose Andersen under Rule 26(b)(4)(A). Rule 26(b)(4)(A) permits discovery of testifying expert witnesses in order to enable the moving party to effectively  prepare its trial cross-examination of the expert. The CLS/BPS Cases are not consolidated for trial with the E & Y/Chase Cases; thus, the CLS/BPS parties have no interest in preparing to cross-examine Andersen at trial; accordingly, there is no basis to permit the CLS/BPS parties the right to depose Andersen as a testifying witness.

Thus, Andersen qualifies as non-testifying expert for purposes of protection under Rule 26(b)(4)(B).

## B. Do exceptional circumstances exist which justify discovery?

■■■ Rule 26(b)(4)(B) "is not an 'impenetrable fortress' against discovery and parties seeking discovery can make a showing of exceptional circumstances when there is no practicable alternative by which they can obtain the information." *Hartford Fire Ins.*, 154 F.R.D. at 207. The party seeking discovery of a non-testifying expert carries the burden of showing exceptional circumstances. *Id.* at 207–08. Courts and commentators have commonly identified two situations where the exceptional circumstances standard has been met. The first situation is where the object or condition observed by the non-testifying expert is no longer "observable by an expert of the party seeking discovery." *See id.;* David S. Day, *Expert Discovery in the Eighth Circuit,* 122 F.R.D. 35, 39 (1988). This situation has been demonstrated where some physical condition has deteriorated enough so that one party's expert may be the only expert who actually could have fairly observed it before its deterioration. *See, e.g., Delcastor, Inc. v. Vail Assoc.,* 108 F.R.D. 405 (D.Colo.1985) (holding that one party's expert who observed a site one day after a mud slide had knowledge unobtainable through any other source); *Sanford Constr. Co. v. Kaiser Aluminum & Chemical Sales, Inc.,* 45 F.R.D. 465, 466 (E.D.Ky.1968) (holding that plaintiff's expert had knowledge unobtainable through any other source where plaintiff refused to allow defendant's experts access to site where ruptured sewer pipe was being removed); *MacDonald Sprague Roofing Co. v. USM Weather–Shield Sys. Co.,* 38 Fed.R.Serv.2d 518 (D.Mass.1983) (compelling discovery of non-testifying expert's report where defendant was unable to test allegedly defective roof since roof had been replaced).

■■■ The second situation commonly recognized as constituting exceptional circumstances is where it is possible to replicate expert discovery on a contested issue, but the costs would be judicially prohibitive. *See In re Agent Orange,* 105 F.R.D. at 581 (compelling discovery of experts retained in a companion case which was part of the same multidistrict litigation because otherwise plaintiffs would have to devote enormous time and resources to duplicating the experts' efforts).

■■■ BPS has made the requisite showing of exceptional circumstances. Andersen was able to observe and analyze AroChem's financial condition as soon as the discrepancy was discovered in December 1991. Andersen apparently had "a broad base charge to just look everywhere and find anything and turn it over twice." The bulk of Andersen's investigation lasted from December 1991 through June 1992, consuming 10,000 hours of time, and involving eight to fifteen people. During this time, numerous other parties were given unlimited access to AroChem's books and records, as well as its personal legal files. Although there is no evidence that any documents were lost during  this time, it was not until October 1993, almost two years after Andersen began its investigation, that the files from AroChem's offices were placed in storage and maintained under close supervision. The same month that the documents were placed in storage, the Bank Group sued CLS, and four months later, in February 1994, the Bank Group sued BPS.

It would be impracticable for BPS to reconstruct AroChem's financial condition, which Andersen had the opportunity to observe and analyze extensively for several months immediately after the discrepancy

was discovered. BPS was sued more than two years after the discrepancy was discovered and more than one year after Andersen and numerous parties had the opportunity to observe, remove, and copy AroChem's files. AroChem's files were placed in storage only after numerous parties had unlimited access to the files over the course of a year or more. It is likely that documents were rearranged and possible that documents were lost or altered over the course of the year that the numerous parties had unlimited, unmonitored access to the files. As noted earlier, at least one of plaintiffs' officers has conceded that it would be more difficult now to reconstruct AroChem's collateral position as of December 1991 than it was for Andersen to reconstruct that collateral position when it conducted its work.

Moreover, even if it were possible to reconstruct Andersen's financial condition, the costs of hiring an expert to reconstruction that situation and then to analyze it would be judicially prohibitive. Andersen itself spent over 10,000 hours over the course of six months, utilizing eight to fifteen people, in investigating AroChem's situation. Given that BPS was sued long after Andersen had already completed the bulk of its investigation, BPS did not have the same opportunity to hire an expert to investigate the situation as the parties who hired Andersen had.

Thus, given the evidence in the record, I conclude that BPS has met is burden of showing exceptional circumstances under which it is impracticable for BPS to obtain facts or opinions on the same subject by other means. This conclusion does not obviate the policy considerations underlying Rule 26(b)(4)(B). Four commonly articulated policy considerations are: (1) the "interest in allowing counsel to obtain the expert advice they need in order properly to evaluate and present their clients' positions without fear that every consultation with an expert may yield grist for the adversary's mill"; (2) the view that "each side should prepare its own case at its own expense"; (3) the concern that it would be unfair to the expert to compel its testimony and also the concern that experts might become unwilling to serve as consultants if they suspected their testimony would be compelled; and (4) the risk of prejudice to the party who retained the expert as a result of the mere fact of retention. *Rubel v. Eli Lilly and Co.,* 160 F.R.D. 458, 460 (S.D.N.Y.1995). None of these considerations changes the court's finding of exceptional circumstances.

Firstly, the interest in allowing counsel to obtain expert advice without fear that the consultation might work against them does not apply here where the party now retaining Andersen—the Bank Group—does not join in this motion opposing discovery and where the party who originally retained Andersen—AroChem—agreed to permit parties with potentially adverse interests—the Bank Group and the U.S. Government—to employ Andersen. Secondly, the policy that each side should prepare its own case at its own expense is not neglected, given Rule 26(b)(4)(C) requiring the moving party to pay the reasonable costs incurred in deposing the expert. Thirdly, the interest in fairness to the expert is not harmed here where there is no evidence that the expert opposed its employment by parties other than AroChem. Fourthly, while there may be some risk of prejudice to AroChem or the Bank Group, the parties who retained Andersen, arising from the mere fact of retention, neither party asserts that there is such risk, since neither party joined in this motion. Also, the risk is minimized by the fact that Andersen has already been employed by more than one party.

## C. Has Andersen's right to expert protection been waived?

Given the conclusion that BPS has demonstrated the requisite exceptional circumstances, I need not reach the question of waiver. Notably, the case law is divided on the question of whether the protection afforded by Rule 26(b)(4)(B) can be waived. *See, e.g., Tennessee Gas Pipeline v. Rowan Cos.,* 1996 WL 344137, at *1 (E.D.La. June 19, 1996); *Vanguard Sav. and Loan Ass'n v. Banks,* 1995 WL 71293, 1995 U.S. Dist. LEXIS 2016 (E.D.Pa. Feb. 17, 1995); *Hartford Fire Ins.,* 154 F.R.D. at 210–12; *United States v. Hooker Chems. & Plastics Corp.,* 112 F.R.D. 333, 338 (W.D.N.Y.1986).

## IV.  CONCLUSION

Defendant BPS's motion to compel depositions of Andersen is **GRANTED,** and Andersen's cross-motion for a protective order is **DENIED.**   Defendant BPS shall serve a copy of this order on the other parties.